OPINION OF THE COURT
Harold Hyman, J.
On September 23,1980, a car owned by defendant Patricia Rochford and operated by defendant Robert C. Clemente struck the infant plaintiff, Lisa Russo, who at the time was riding a bicycle. Shortly thereafter, a negligence action ensued demanding judgment in the sum of $1,000,000 for the injured plaintiff and $300,000 for her mother and natural guardian. Defendant Clemente fell within the omnibus coverage of his codefendant’s automobile liability policy with Aetna Insurance Company (hereinafter Aetna) and the nonowned automobile coverage of his father’s *56 liability policy with Allstate Insurance Company (hereinafter Allstate). After a default judgment was taken against the defendants for so-called “law office failure” by counsel retained by the automobile owner’s insurer and the matter came on for an inquest, the two above-named carriers entered into a stipulation in open court with plaintiffs agreeing that the infant plaintiff was entitled to $110,000 in full settlement of her claim, a sum above Aetna’s $10,000 policy limits. However, waiving their rights to appeal, both carriers called upon this court to determine the relative responsibility of each carrier for the default and to apportion the $100,000 excess sum as between these carriers in accordance with its ultimate decision.
Having undertaken an exhaustive and time-consuming review of the relevant case law in this area so as to effectuate a disposition based in legal precedent, it appears that in the context of this dispute the central issues are of first impression in this State. These issues are concisely stated below:
(1) In relation to an insurer’s contractual duty to defend, what is the proper allocation of the burden of defense between the primary and excess insurance carrier in “coincidence cases?”[1]
(2) In handling the defense of the insured, how is the relationship between the primary and excess insurance carrier on the one hand, and between the insured and the respective carriers on the other, defined and measured, and what duties and obligations attend such relationships?
(3) Where the primary insurance carrier has assumed control of a lawsuit, what is the extent of any duty which the excess insurance carrier may have with respect to defense of a claim against the insured, and just what must occur before the excess carrier may be called on to assist in the defense?
DUTIES OF A PRIMARY INSURER TO AN EXCESS INSURER
Where an excess insurer rather than an insured is obligated to pay that part of the plaintiff’s judgment which is greater than the primary insurer’s policy limits, the courts *57 have granted a right of action to the excess insurer to recover its damages from a primary insurer where the primary insurer has breached its duty to settle litigation in good faith or acted negligently in the defense of the underlying action. A review of those cases reveals a number of theories upon which recovery has been allowed: (1) the theory that the excess insurer is equitably subrogated to the rights of the insured against the primary insurer; (2) the theory that the primary insurer owes a direct duty to the excess insurer; and (3) the theory that the primary insurer, excess insurer, and the insured owe to each other a triangular reciprocal duty to use due care in the handling and settling of claims against the insured.
(1) EQUITABLE SUBROGATION
Basically, through the vehicle of equitable subrogation, a primary insurer is responsible to an excess insurer for a verdict in excess of the primary policy limits if the primary insurer breached its implied obligation to manage the insured’s defense in good faith by failing to bring about a settlement within the policy limits (St. Paul Fire & Mar. Ins. Co. v United States Fid. & Guar. Co., 43 NY2d 977; cf. Lisi v Nepola, 84 AD2d 560, affd 56 NY2d 708).
It is insignificant that the major portion of litigation between primary and excess insurers arises out of situations where there has been a breach of the implied obligation to settle claims in good faith. In essence the rights owed the excess insurer are derived from the duty owed the insured, one of those duties being the distinctly recognized contractual duty to defend with due care. If a breach occurs in meeting either the settlement or defense obligations, the excess insurer may recover from the primary.
To effect a recovery, the first means employed to bridge the lack of a contractual relationship, or lack of privity, between the primary and excess insurer was equitable subrogation. Once obliged to discharge the primary insurer’s liability for a judgment in excess of the primary insurance policy, the excess insurer effectively stands in the shoes of the insured and is permitted to assert all claims against the primary insurer which the insured himself could have asserted. This principle has been cited *58 with approval by the Court of Appeals in St. Paul Fire & Mar. Ins. Co. v United States Fid. & Guar. Co., (supra).
Whether excess liability should be imposed upon Aetna, as primary insurer, depends upon whether its conduct in defending Clemente, the permissive user, violated the negligence standard established in this jurisdiction (as previously described) for imposition of excess liability in a suit brought by the insured against its insurer. In due course, this will be discussed in full.
Finally, it cannot be overemphasized that, since subrogation is an equitable remedy, the excess insurer’s obligations, vis-a-vis the primary insurer, must be given equal consideration. Hence, as succinctly stated in Home Ins. Co. v Royal Ind. Co. (68 Misc 2d 737, 740, affd 39 AD2d 678, app den 31 NY2d 641): “Just as [the primary insurer] owed [the excess insurer] the duty of negotiating in good faith so [the excess] owed [the primary] the contractual duty of cooperation and the common-law duty to mitigate damages.” This court views the Home Ins. Co. decision as a proper and logical extension of the adoption of equitable subrogation by an excess insurer of the insured’s right against a primary insurer. In the context of this case, not only would Allstate, as excess insurer and equitable subrogee, be entitled to enforce Aetna’s primary duty to defend with reasonable care a claim against their common insured, but Allstate would equally be obliged, as Aetna suggests, to cooperate with Aetna, where needed, in furnishing such a defense.
(2) DIRECT DUTY OWED BY PRIMARY CARRIER TO EXCESS CARRIER
Until recently, an excess carrier’s only action in this State against a primary insurer was in equitable subrogation. With the decision in Hartford Acc. & Ind. Co. v Michigan Mut. Ins. Co. (93 AD2d 337, mot for lv to app granted 95 AD2d 738), the Appellate Division, First Department, has joined the minority of courts that have upheld the right of the excess insurer to recover from the primary insurer upon the basis of a direct duty owed by the primary to the excess.
Briefly stated, the action in Hartford (supra) involved the alleged bad faith and breach of fiduciary duty owed to
*59 plaintiff by Michigan Mutual as primary insurer, in the underlying action, and malpractice by counsel for the prime carrier in that action, in failing to name the injured party’s employer in the underlying negligence suit though the excess insurer had demanded of the primary insurer and its attorneys that this employer be impleaded as a third-party defendant. The concern of the appellate court was with the nature of the remedy available to Hartford, as excess carrier, against Michigan Mutual, as primary insurer. The issue was delineated as follows: Whether Hartford had a valid cause of action “in its own right” against Michigan Mutual and, if so, whether Special Term erred in concluding that Hartford could not proceed in its individual capacity and any relief which could be sought was solely as subrogee of its insureds.
The essence of Hartford’s claim was that Michigan Mutual breached its fiduciary obligation to its insureds and to Hartford, as the excess insurer, in that by not proceeding against the employer as a third-party defendant, Michigan Mutual sought to avoid additional liability which would have attached to Michigan Mutual since it was also the workers’ compensation insurer of the employer. In finding that Michigan Mutual, as primary carrier, was in full control of the defense in the underlying action and that by failing to implead the employer, the primary carrier placed its own interest above that of the excess carrier, the court, in no uncertain terms, stated: “Michigan Mutual, to whom the defense of the underlying action had been entrusted, owed a primary obligation to its assured and to the excess insurer to exercise good faith in handling the defense and to safeguard the rights and interest of the excess carrier. As primary insurer, it acts as a fiduciary and is held to an exacting standard of utmost good faith. Any such right of action arises as a result of the independent and direct duty to the excess insurer and is not dependent upon equitable principles of subrogation”. (Hartford Acc. & Ind. Co. v Michigan Mut. Ins. Co., 93 AD2d 337, 342, supra; emphasis added.)
The holding in Hartford (supra), is significant since an important distinction exists between the theories of equitable subrogation and a direct duty owed by the primary to *60 the excess. Under the theory of equitable subrogation, the excess insurer succeeds to whatever rights the insured has against the primary insurer. Thus, under this theory, the rights of a subrogee can never be greater than those of the subrogor (State Bank v Dan-Bar Constr. Co., 12 AD2d 416, affd 12 NY2d 804; Matter of New Amsterdam Cas. Co. v McMahon, 196 Misc 746), which principle could result in barring recovery by the excess insurer from the primary insurer in the event of any wrongful conduct on the part of the insured. In contrast, if a direct duty is owed by the primary to the excess, the insured’s conduct would seem to present no obstacle to the excess insurer’s cause of action against the primary insurer. Accordingly, as applied to this case, the precedential value of the direct duty theory to Allstate, as excess carrier, is that its rights and interest will not necessarily be dependent upon the conduct of Robert Clemente, the insured, in exercising his obligation to cooperate with the primary insurer in his defense. However, this does not alter the defense obligation which each carrier, Allstate and Aetna, owe to the common insured with whom each has a contract, or the responsibility that Allstate as an excess carrier has to assist the primary in the defense of a claim against the insured.
(3) TRIANGULAR RECIPROCITY
At least one court, the Court of Appeal in California in Transit Cas. Co. v Spink Corp. (94 Cal App 3d 124), has recognized a tripartite duty of due care between the insured, primary, and excess insurer as a basis for the excess carrier’s recovery against the primary carrier and insured for wrongful refusal to settle. Notwithstanding that the decision, unlike the instant matter, arises within the context of an action alleging a wrongful refusal to settle and has been disapproved in part by the California Supreme Court insofar as it allowed recovery against the insured for negligent failure to settle (see Commercial Union Assur. Cos. v Safeway Stores, 26 Cal 3d 912, 921), the opinion does set forth a realistic expression of the rights and duties between excess and primary carriers: “Tested as an indispensable element of the excess carrier’s claim, equitable subrogation fails to achieve evenhanded justice * * * [The primary and excess carriers] [u]sually * * * have no contractual privity inter se. They are however fully aware of *61 their respective roles and of the significant differences in their obligations to the insured * * * When an accident occurs, they become totally aware of each other. When the settlement value of the injury hovers over the upper limit of primary coverage, the two carriers face inter-acting problems of claim adjustment, settlement and defense. Each has a choice of mutual support or naked self-interest. The law, then, would be unrealistic in demanding that either carrier use the policyholder as its stepping stone to the assertion of a mutual obligation to each other. Triangular reciprocity is far more rational.” (Transit Cas. Co. v Spink Corp., 94 Cal App 3d 124, 132-133, supra; emphasis added.)
The triangular reciprocal duty of due care was also seen as promoting the “sharing of the loss according to the measure of each party’s comparative fault.” (Transit Cas. Co. v Spink Corp., 94 Cal App 3d 124, 134, supra.)
Several points should be noted with respect to application of the triangular reciprocity theory to the current dispute. In this matter, the primary and excess relationship did not arise by the specific design of the insured. Rather, this matter involved an automobile accident in which the driver who was a defendant in the personal injury action was driving a borrowed car. In such circumstances, the owner’s policy provided the primary coverage and the driver’s insurer, by coincidence, provided the excess coverage. Thus, it was by sheer happenstance that the two carriers came to enjoy a primary and excess relationship, inter se, each carrier having a direct contractual relationship with a common insured. Nothing beyond the mere existence of the insurer-insured relationship is required to justify imposition of the insurer’s duty to defend and the insured’s duty to cooperate; the duties of one party mirror or mesh with the duties of the other.
On a different level, recent authority in this jurisdiction, as previously noted, upholds the right of an excess insurer to proceed against a primary insurer for negligent and bad-faith failure to defend a claim exceeding the threshold of excess coverage. Left unresolved, however, is the obligation, if any, owed by the excess carrier to assist or participate in defending a claim against the insured and the *62 proper allocation of the burden of defense between the primary and excess insurance carrier in a coincidence case.
ALLOCATION OF THE DUTIES OF DEFENSE BETWEEN PRIMARY AND EXCESS INSURERS
There is much disagreement among the courts as to the proper allocation of the burden of defense between primary and excess insurers in coincidence cases. The cases may be basically divided into two groups: (1) those holding that the primary has the entire duty of defense; and (2) those holding that the excess has some duty of defense. Even in this latter group, however, there is disagreement as to how extensive the excess carrier’s duty is and just what must occur before the excess may be called on to provide a defense.
A main source for this conflict is the policy language in the respective insurance contracts. In coincidence cases, “other insurance” clauses fail to adequately address which carrier shall have the duties of defense.
As previously discussed at some length, in coincidence cases the automobile owner’s policy coverage will generally be deemed primary with the resultant obligation upon the owner’s insurer to provide in the first instance a defense in the negligence suit, including the selection of counsel.
Some courts have expressed the rigid view that the excess policy, by its very nature, is secondary and not equal to the primary carrier’s obligation to defend (Fidelity Gen. Ins. Co. v Aetna Ins. Co., 27 AD2d 932; Macloskie v Royal Ind. Co., 254 F Supp 782). Thus, the primary carrier generally conducts the entire investigation, adjustment and defense of a case. Support of this view is not illogical: the primary carrier is the one with the most immediate exposure in the litigation; the primary carrier chooses which counsel will defend the insured; and placing the onus of defense upon the primary carrier has a certainty about it which enables both carriers to set premiums with this potential cost in mind.
Yet there are occasions when the excess carrier will find it expedient to take over or participate in the defense where, for example, the primary carrier refuses to defend *63 (Aetna Ins. Co. v Allstate Ins. Co., 33 AD2d 551, app dsmd 26 NY2d 838), or the exposure to the excess might be great and the primary carrier with very low limits is providing a defense which is deemed less than adequate by the excess carrier (American Home Assur. Co. v Employers Mut. of Wausau, 64 AD2d 563).
Less obvious is the role to be played by the excess carrier during the discovery stage of a negligence suit, the defense of which is in the control of the primary carrier. Stated otherwise, what responsibility lies with the excess carrier to assist the primary carrier during the course of the litigation, to whatever extent required, so as to avoid the potential for a default judgment beyond the primary’s policy limits for failing to furnish, in compliance with repeated court orders, certain insurance information demanded by plaintiff and in possession of the excess carrier.
In examining the extent of any duty which the excess carrier may have with respect to defense in a coincidental insurance setting, a review of the decisions from the various jurisdictions demonstrates that there is a split of authority on this point. In Lujan u Gonzales (84 NM 229, cert den 84 NM 219), where the excess insurer (Allstate) refused to defend its insured, who had been the driver of a third-party vehicle, because the automobile owner’s insurer (Farmers) defended, as primary insurer, under its own policy contract, the court determined that the driver was insured under his own policy and that his insurer, as excess carrier, also had a duty to defend. The Appellate Court of New Mexico (supra, p 233) flatly rejected the excess carrier’s argument that, as excess insurer, it had no duty to defend and that the duty rested upon the primary insurer:
“Allstate had a duty to defend and a duty to pay the amount of any excess within its policy limits. The fact that Allstate’s insurance was excess did not relieve it of its duty to defend * * *
“Allstate’s duty to defend did not cease to exist because Farmers was defending Gonzales [the driver]. Allstate had the duty to assist in that defense. Southern Farm Bureau Cas. Ins. Co. v. Allstate Ins. Co., 150 F. Supp. 216 (W. D. Ark. 1957).”
*64 The court in Lujan did not specify what manner of assistance was required of the excess carrier.
In a similar case involving the same excess carrier, Southern Farm Bur. Cas. Ins. Co. v Allstate Ins. Co. (150 F Supp 216), the United States District Court for the District of Arkansas entered a declaratory judgment that Allstate as excess carrier had “a duty to assist in the defense” of a claim against the insured but did not specify what manner of assistance would be required. Basic to the court’s opinion was reliance on the rule, likewise recognized in this State, that the duty to defend is separate from the duty to indemnify; that the former, unlike the latter, need not be exhausted before the excess carrier’s duty to defend begins.
The conflicting view that the primary carrier bears the entire burden of defense is most clearly stated in Macloskie v Royal Ind. Co. (254 F Supp 782, 792, supra). The Macloskie court concluded that the owner’s insurer’s policy afforded primary coverage up to the limits of liability in its policy “with the resultant obligation to be fully responsible for [the insured’s] defense in the * * * suit” and that the driver’s policy was “secondary and excess coverage only” and the excess carrier had “no responsibility to defend [the insured].” Though not clearly indicated in the opinion, it appears that the United States District Court of South Carolina took the view that both the duty of indemnification and the duty of defense are excess to the other insurance available.
Insofar as the view expressing the excess carrier’s “duty to assist in the defense,” the issue before this court is not whether the excess carrier’s “duty to assist in the defense” requires it to retain separate counsel for its insured or may be satisfied by the excess carrier’s payment of a share of the costs of retaining a single attorney to represent the insured. In addition, the intention of this court is not to depart from the view that, in the context of a coincidental insurance situation, the primary carrier is obliged in the first instance to provide a defense in a negligence suit against the common insured. Adhesion to this rule, however, does not detract from the issue raised by the present fact pattern concerning the duty which the excess carrier may have, however peripheral, with respect to assisting, *65 participating, or perhaps merely cooperating with the primary carrier where the defense of a claim against the insured on the merits is in jeopardy of default. Usage of the term “co-operate” should not be equated with the contractual duty of cooperation imposed upon the excess insurer by virtue of its standing as the equitable subrogee of the rights and obligations of the insured. (See Home Ins. Co. v Royal Ind. Co., 68 Misc 2d 737, supra.) In such capacity, one may recall, the excess carrier would be subject to any defenses, such as the failure to cooperate, that could be asserted regarding the conduct of the insured. Factually, the assertion of such a defense by Aetna against Allstate based on Robert Clemente’s (the insured) less than desirable cooperation in procuring with due diligence the demanded excess policy or verification thereof, appears on its face to be viable. Yet, the inability to prove any “ ‘willful and avowed obstruction,’ ” as required by the case law (see Thrasher v United States Liab. Ins. Co., 19 NY2d 159, 170), would defeat any claim Aetna might have had against Allstate because under equitable subrogation the excess carrier’s obligations to the primary are tied to the requisite legal requirements against which the conduct of the insured is measured.
In contrast, the theoretical underpinning of the direct duty between the primary and excess insurers, as established in Hartford (93 AD2d 337, supra), is the recognition that the two carriers face interacting problems, not limited solely to claim adjustment and settlement, but also, as in this case, to the conduct of the defense. Therefore, the nature of the primary-excess relationship in a defense context imposes a somewhat reciprocal, though independent, duty upon the excess carrier to share the primary’s burden to defend. Consequently, the degree of assistance, participation, and cooperation expected of the excess carrier will be a direct function of its knowledge that the insured party’s claim invades the excess policy limits and that certain information under its control is essential to the primary insurer’s defense of the negligence suit or subject to disclosure therein by court order or otherwise.
For breach of the duty to assist in the defense, the excess carrier, not unlike the primary carrier which breached its *66 duty to defend, is liable for a proportionate share of the damages resulting from its breach.
Having concluded that Allstate had a direct duty to assist or, at the very least, to cooperate in the defense of Clemente, the issue then becomes one of determining at what point that duty arose.
The facts establish without contradiction that, after receiving what she considered to be an unsatisfactory response from the defendants to plaintiffs’ insurance demand and the court order directing compliance, plaintiffs’ attorney gave prompt written notice to the excess insurer, at its office located in Elmhurst, Queens, stating the nature of the litigation, furnishing to Allstate the names of its alleged insureds, and the license plate registration numbers of two vehicles allegedly covered by Allstate, in addition to imparting to Allstate the primary carrier’s policy limits and the fact that defendant Clemente had thus far failed to comply with an outstanding court order directing disclosure of the insurance information demanded by plaintiffs. Moreover, this letter was denominated as “formal notice” to Allstate of the plaintiffs’ intention to hold Allstate liable as excess insurer.
As an aside, the letter simultaneously issued to the Benjamin Purvin, Esq., law offices cannot, as Aetna suggests, be deemed the equivalent of notice to the alleged excess insurer. The affirmation of the attorney associated with the office of Benjamin Purvin, Esq., clearly reveals that, insofar as concerns the Russo litigation, his office was at no time notified or instructed by Allstate to protect the interests of the Clementes in the underlying negligence suit.
Both the statutory and case law of this State provides for the injured party’s independent right to give notice to the insured’s carrier despite the failure of the insured to provide timely notice of the accident. (General Acc. Ins. Group v Cirucci, 46 NY2d 862, 863-864; Lauritano v American Fid. Fire Ins. Co., 3 AD2d 564, 569-570, affd 4 NY2d 1028; Insurance Law, § 167, subd 1, par [c].) The above-cited statute establishes the right of the injured person or other claimant to give written notice to “any licensed agent of the insurer in this State, with particulars sufficient to *67 identify the insured,” which notice “shall be deemed notice to the insurer.” Thus, as stated in the subject Allstate policy in its “Notice” provision: “If [written] notice is given to a New York licensed Allstate agent, it shall be deemed notice to Allstate.”
The purpose behind this provision is to avoid charging the injured party vicariously with the insured’s delay or failure to notify, and its application extends as well to an excess carrier’s notification of the occurrence or suit (see Home Ind. Co. v State Farm Mut. Auto. Ins. Co., 64 AD2d 212). Therefore, whether or not the Clementes kept their insurer informed regarding the litigation and the demand for the policy is irrelevant since the injured party, through counsel, took such initiative.
Examination of both the 1981 White and Yellow Pages for Queens County, of which this court takes judicial notice, reveals that the Allstate office in Elmhurst, Queens, was properly selected by plaintiffs’ attorney as the recipient of the injured party’s written notice, inasmuch,as that office, a New York licensed Allstate agent, indeed was one of only two designated Allstate “Claims Offices” based in Queens County.
Some courts have considered notice to the excess insurer as imposing an immediate duty to participate in the defense of the insured. For example, in Signal Cos. v Harbor Ins. Co. (159 Cal Rptr 10,13), the appellate court concluded that the excess insurer had a duty to defend upon “notice [of the] possibility that the claim * * * might invade the excess coverage”. As previously noted, the nature and degree of participation in defending the insured would be relative to the particular State’s rule concerning the burden of defense and the circumstances necessitating the excess carrier’s participatory role.
In this matter, the facts starkly reveal Allstate’s utter indifference in the face of the indisputable receipt of not only the above-referenced letter from plaintiffs’ counsel, but also the plaintiffs’ two follow-up motions to strike for noncompliance as well as a copy of the default order eventually issued November 2,1981, by Justice Kassoff. At the very least, plaintiffs’ attorney’s initial notification identifying the Clementes as alleged insureds of Allstate *68 plus their vehicle registration numbers, should have evoked a response from the insurer’s claims office verifying or denying that such an Allstate policy was issued to Vincent Clemente and in effect on the date of the occurrence which would provide additional coverage to the defendant Clemente. With the computer advances in common use today, and needless to say at the disposal of Allstate in 1981, retrieving the above-described information would have entailed but a minimum effort by Allstate personnel, and certainly less so than the burdening time and expense imposed upon the litigants and the court process. In essence, Allstate had several opportunities throughout the prolonged and at times confusing discovery contest to end speculation over as simple a matter as the availability of excess coverage.
One should not minimize how important the production of all insurance agreements can be in disposing of litigation. The purpose behind passage of CPLR 3101 (subd [f]) was to accelerate settlement of claims by affording the plaintiff knowledge of the limits of defendant’s liability policies (Siegel, NY Prac, § 344, p 422; NY Legis Ann, 1975, p 59). The pretrial disclosure of a defendant’s liability insurance policies, which includes all primary and excess coverage (Love v Meisner, 107 Misc 2d 1003), allows the parties to enter into realistic negotiations, thereby maximizing efforts at settlement.
In one of the first decisions on an application for discovery of insurance policies pursuant to the then recently enacted CPLR 3101 (subd [f]), a Judge of this Supreme Court (Justice Leonard L. Finz, Jr.) suggested that among the mechanics and standards which would satisfy compliance with the subject provision was (1) submission of a certified or true copy of the policy to be submitted to the demanding party; or (2) furnishing the demanding party with “a statement under oath containing such information as he may require addressed to the existence and contents of the.subject insurance policy.” (Hernandez v Jones, 84 Misc 2d 805, 806-807; emphasis added.)
Thus, in accord with the above, Allstate could have fulfilled its obligations by submitting either a certified or true copy, if existent, of its automobile insurance policy *69 covering defendant Clemente on the date of the occurrence, or a sworn statement by an Allstate representative advising plaintiffs’ attorney that a search was undertaken to confirm the existence of such a policy and its available coverage and reporting the results of its investigation. Succinctly stated, what was required by Aetna from Allstate, rather than stone silence, was assistance and cooperation in expeditiously furnishing the information both in its control and subject to court order. It is not implausable that with early awareness of the existence of a second insurer’s $100,000 policy limits, plaintiffs’ claims might have been settled to the satisfaction of all concerned, thereby dispensing with court intervention.
Though Allstate’s inactivity cannot be construed as motivated by “named self-interest,” the failure to undertake its investigatory duty, as encompassed within the duty to defend and in accord with its obligations to the defendant insured and the primary carrier, can only be characterized as negligence by the excess carrier and a proximate cause of the default. The courts have construed as akin to law office failure, the failure of an insurance company to take prompt action to avoid a default, which, as a matter of law, is insufficient as an excuse (Kerwin v Sellig, 91 AD2d 705; Kliman v Hutchinson Assoc., 91 AD2d 626; Bruno v Village of Port Chester, 77 AD2d 580).
Such negligence on the part of the excess insurer which contributed to causing the default, would not exempt Aetna as primary insurer from the imposition of a portion of the liability beyond its policy limits resulting from the negligent conduct of the attorneys retained to defend the insureds. As previously established, once the primary insurer assumes the duty of defending the insureds, its responsibility is to conduct the defense with due care and in utmost good faith, and it is liable for damages resulting to the insured by reason of its negligence in performing such duty, although they exceed the policy limits. To the insured, the primary insurer’s duty to defend arises solely from the language of the insurance contract, and now, as a matter of law, the primary insurer owes a direct fiduciary obligation to the excess insurer to exercise good faith in handling the defense and to safeguard the rights and *70 interest of the excess carrier. Added to these recognized principles, is this court’s present holding that there is a concomitant duty of the excess insurer to its insured and to the primary insurer to at times, and when reasonably called upon, assist and cooperate in the defense, the violation of which exposes the excess carrier to liability. In sum, equitable apportionment of liability may be claimed among these insurers for violation of their independent duties to the insured and to each other, and it is not necessary that each insurer be charged with the commission of a tort (see Jakobleff v Cerrato, Sweeney & Cohn, 97 AD2d 834; McLaughlin, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C1401:3, p 362; Twentieth Ann Report of NY Judicial Conference, 1975, p 215).
In apportioning fault, one must therefore examine how Aetna (by counsel retained to defend the insureds) conducted itself throughout the preliminary proceedings leading up to and culminating with the judicially declared default of the defendants. Allstate contends that Aetna, the insurer primarily responsible for defending the insured permissive user, defendant Clemente, was guilty of law office failures and neglect in the management of the defense, as exemplified by its failure to appear and submit opposition against motions for disclosure of insurance and its failure to properly comply with various preclusion orders. In response, Aetna argues that it diligently pursued the defense of the underlying negligence suit, by interposing an answer, proffering opposition to motions, complying with court orders to the best of its ability, communicating with defendant Clemente and his personal attorney, communicating with Allstate and Benjamin Purvin’s office, and further utilizing the appeal process to have the default orders vacated. Aetna places full responsibility for the default squarely on the shoulders of Allstate for failing to timely furnish the requested insurance information exclusively in its control, or even responding to the numerous inquiries pertaining to its alleged policy of insurance providing coverage to the defendant, Robert Clemente.
Up to this point, analysis of the facts as they pertain to Allstate has led to the conclusion that the excess insurer *71 was negligent in failing to perform its contractual and implied legal obligations to the insured and the primary insurer, respectively, and that such negligence was a substantial factor in bringing about the default. Yet, while Allstate does not and cannot dispute the fact that the eventual default by the defendants originated with its omission to act, and, while there is some question over what might be described as highly tenuous responses by the Clementes and their personal attorney in procuring the phantom insurance policy or information pertaining thereto,[2] none of these factors detract from the fact that it was Aetna’s (and its attorneys’) obligation in the first instance to diligently represent the insured defendants throughout the pretrial stages of discovery, and in particular, to engage plaintiffs’ motion practice with timely and responsive opposition satisfactory to the court.
Neither this court nor the primary insurer can ignore Justice Kassoff’s final determination, as affirmed without opinion by the reviewing court, that the law firm representing the interests of the defendants was guilty of repeated “law office failures” which, under the then applicable rule established in Barasch v Micucci (49 NY2d 594), were legally insufficient to excuse a default in a proceeding. Additionally, even if the appellate court was empowered, which it is not, to re-examine the acts or omissions by defendants’ attorney under the recent amendments to the CPLR (see CPLR 2005, 3012, subd [d], as added by L 1983, ch 318),[3] such statutory changes far from excuse all instances of law office failure (see Bernard v City School Dist., 96 AD2d 995 [defendant’s insurer inexcusably casual about forwarding summons and complaint to its attorney, the court finding the delay “inordinate” and “not explained”]).
Yet aside from the underlying basis for Justice Kassoff’s denial of defendants’ renewed motion to vacate their default, to wit: failure by defense counsel to show a justifiable excuse for not moving to vacate the default for almost two *72 months (55 days) after the order was served upon it (as reviewed by this court, infra), the file is nevertheless replete with examples of Aetna’s or its attorneys’ mishandling of the motion practice involving the disclosure of the insurance agreements. Most noteworthy is that the negligent conduct displayed by Aetna and its defense counsel was completely independent of Allstate’s consistent failure to assist and cooperate with Aetna or defendants’ attorneys and is, therefore, examined on its own merits.
The following are prime examples of the independent acts of negligence evidenced by Aetna or defendants’ attorneys:
(1) Soon after issuance of the first court order (March 30, 1981) directing disclosure of the insurance agreements specified in plaintiffs’ demand, Aetna’s claims representative, through various letters, communicated with defendant Clemente, his father, and his personal attorney regarding said demand and ascertained that the defendant’s father did in fact own two vehicles. He then attempted to shift the onus of obtaining the requested insurance information upon the plaintiffs’ attorney, implicitly suggesting that Aetna had fully discharged its obligations.
Irrespective of the fact that defendant Clemente was not Aetna’s “named insured,” he was an omnibus insured primarily covered under the Aetna policy issued to codefendant Rochford, and, thus, to that extent certainly more subject to the control and influence of Aetna than the plaintiffs’ attorneys. As with any insured, Aetna, unlike plaintiffs’ attorneys, had the option to invoke its contractual right to disclaim coverage.
(2) The failure by defendants’ defense counsel to oppose the plaintiffs’ June 23, 1981 motion to strike was admittedly due to error on the part of the law firm’s motion clerk. In his attempt to convince the court that exhaustive efforts had been undertaken by Aetna to obtain the so-called excess policy, defense counsel had the temerity to suggest that plaintiffs’ attorneys take the initiative to seek the deposition of defendant Clemente’s father as a nonparty witness and subpoena his automobile insurance policies.
*73 Most puzzling is that the foregoing arguments were included in a separate motion to vacate defendants’ nonappearance on the motion to strike almost two weeks before Justice Lakritz had disposed of plaintiffs’ motion. This procedure begs the question regarding defense counsel’s course of action: If an inquiry had been made of the Special Term Calendar Clerk as to whether or not plaintiffs’ motion was still pending, and if it was still pending, could not defendants’ attorney have then sought either (a) the consent of plaintiffs’ counsel or the court to an extension of time to submit opposition, or (b) move by order to show cause to vacate defendants’ default on the motion, requesting reference of the vacatur motion to the Justice deliberating on plaintiffs’ motion to strike for noncompliance?
Instead, the July 14, 1981 conditional order was rendered without the opportunity to give consideration to defendants’ position. In any event, the court ordered “full compliance” within 10 days after service, or if no such insurance was available, statements to that effect under oath from the named defendants.
(3) Defendants’ attorney was on vacation when a copy of the afore-mentioned conditional order was served on August 21, 1981. Yet upon his return, and after contacting defendant Clemente’s personal attorney and advising him of the outstanding court order, counsel ascertained that the Clementes had furnished the Allstate policy to plaintiffs’ attorneys. Rather than verify with his client that the Allstate policy had in fact been mailed and confirm with his adversary that the sought after insurance agreement was in fact received and in “full compliance” with plaintiffs’ demand and the prior court orders, defendants’ attorney chose instead to consider the matter closed, relying on his assumption that the required policy had indeed been furnished to plaintiffs’ attorneys and satisfactory to them. Again, the handling of this aspect of the defense demonstrated a sense of listlessness and carelessness on the part of defense counsel, hopefully not reflective of the primary insurer’s de minimis exposure. This too was cited by the court in its February 22,1982 order as an example of “law office failure.”
*74 As it turned out, defendant Clemente later executed an affidavit in which he attested to his search for the Allstate policy and subsequent mailing of a copy (or possibly the original) “to Aetna * * * or [its] investigator.” If this statement was indeed accurate and verified early on, defense counsel would have been forewarned that the Allstate policy, presumably in possession of Aetna and not plaintiffs’ attorneys, had never in fact reached its ultimate and essential destination, namely, the seeker of the document.
The direct causal relationship between these repeated negligent acts or omissions and the default judgment rendered against the defendants is self-evident. In fact, the court would not be engaging in baseless speculation to suggest that had the primary insurer and its chosen counsel displayed more diligence and prudence in the handling of this pretrial aspect of the litigation the defendant insureds would not have been made to suffer the drastic penalty of having their responsive pleading stricken.
CONCLUSION
In weighing the relative degrees of fault of each insurer and considering as between them what portion of the total liability each is responsible for, this court has fixed the percentages of fault as follows: Aetna’s liabaility is 60% and Allstate’s liability is 40% of the $100,000 settlement figure representing the excess of the primary policy limits.
The assignment to Aetna of a greater percentage of fault is a reflection of its separate and distinct responsibility to take control of the defense of the insureds and the greater extent to which its conduct deviated from both the defense duty and fiduciary obligation respectively owed to the defendants and the excess carrier.
Accordingly, plaintiffs shall enter an order-judgment against the defendants for $110,000, of which sum defendants Rochford and Clemente shall be indemnified $70,000 by Aetna and $40,000 by Allstate, with interest as agreed from the 19th day of January, 1983, without costs or disbursements.

. As will be explored further on in this opinion, coincidence cases arise where, for example, a driver is involved in an accident while operating a borrowed vehicle and thus may be insured under both his own policy and the omnibus clause of the owner’s policy.

. Since the conduct of neither the Clementes nor their personal attorney, James Fuery, have been directly placed in issue for resolution, this court opts to avoid making definitive findings or legal conclusions as may reflect upon such conduct.

. The amendments only apply to cases still sub judice as of their effective date (June 21, 1983).