IT IS SO ORDERED.

**SOO LINE RAILROAD COMPANY,**
Plaintiff,

v.

**CMC REAL ESTATE CORPORATION**
and Chicago Milwaukee Corporation,
Defendants.

**CHICAGO MILWAUKEE
CORPORATION,**
Counterplaintiff,

v.

**SOO LINE RAILROAD COMPANY,**
Counterdefendant.

**No. 90 C 2493.**

United States District Court,
N.D. Illinois, E.D.

Feb. 14, 1994.

Michael Timothy Brody, Jenner & Block, Randall E. Mehrberg, Chicago, IL, for Chicago Milwaukee Corp.

Marvin F. Metge, Bruce Craig Spitzer, Gorham, Metge, Bowman & Hourigan, Maureen Ann McGuire, MacCabe & McGuire, Chicago, IL, for Soo Line Railroad Co.

## MEMORANDUM OPINION AND ORDER

LINDBERG, District Judge.

CMC Real Estate Corporation and Chicago Milwaukee Corporation (collectively "CMC") have filed a motion for partial summary judgment against Soo Line Railroad Company ("Soo") pursuant to Rule 56 of the Federal Rules of Civil Procedure. CMC has moved for summary judgment on count III of Soo's amended complaint, wherein Soo seeks damages for the alleged failure of the Trustee of the Chicago, Milwaukee, St. Paul & Pacific Railroad Company ("Milwaukee Road") to turn over certain subordinated debentures issued by the Trailer Train Company. CMC has also moved for summary judgment on count VIII of its counterclaim for Soo's alleged breach of duty to defend CMC in two Wisconsin state court personal injury lawsuits. CMC also seeks summary judgment as to liability only on counts III and IV of its counterclaim for Soo's alleged trespass upon two rail properties owned by CMC, the Eighth Street Coach Yard and the Minneapolis Lite Yard. CMC has further moved for summary judgment on count VII of its counterclaim to enforce a prior court order which directs Soo to purchase or lease the Beer, Rockford and C & E railroad lines. Soo has moved to dismiss count VII of CMC's counterclaim without prejudice.

### I. *Subordinated Debentures*

On December 19, 1977, the Milwaukee Road filed a petition for reorganization under section 77 of the Bankruptcy Act of 1898,

formerly 11 U.S.C. § 205. *In re Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 827 F.2d 112, 113 (7th Cir.1987). The Milwaukee Road was required to continue rail operations during the reorganization proceedings to meet the public interest goal of section 77 in preserving existing rail operations. *In re Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 830 F.2d 758, 760 (7th Cir.1987). The Milwaukee Road's continued operations produced massive deficits. In 1978, the first year after the reorganization petition was filed, the Milwaukee Road lost $82 million. In 1979, the railroad lost an additional $118 million. Having sustained losses in excess of $200 million, the Milwaukee Road sought permission to liquidate in 1980. *Id.* at 760.

In light of these massive losses, the reorganization court concluded the Milwaukee Road could not be successfully operated and its rail assets should be sold. The Grand Trunk Corporation, Soo and the Chicago & North Western Transportation Company ("CNW") submitted bids for the Milwaukee Road's assets. See *In re Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 799 F.2d 317, 319 (7th Cir.1986). Soo made a final bid of $150 million including the assumption of the Milwaukee Road's liabilities. CNW offered $360 million for the rail assets and agreed to assume the railroad's liabilities. Although CNW's bid exceeded Soo's by $210 million, Judge McMillen approved Soo's bid since he believed it would better serve the public interest by preserving more jobs. *Id.* at 320.

On February 19, 1985, Judge McMillen divided the Milwaukee Road into a non-core properties division (CMC Real Estate) and a core rail assets division to be sold to Soo. That same day, Soo purchased the core rail assets from the Trustee pursuant to an asset purchase agreement. The asset purchase agreement was amended by letter agreement, also dated February 19, 1985, to include 500 shares of common stock issued by the Trailer Train Company. Paragraph four of the letter agreement states that Soo agreed to purchase "all of the equity interest of the Trustee in the Trailer Train Company ... consisting of 500 shares of Trailer Train

common stock." The letter agreement specifically provided: "This letter will confirm our prior discussions and, on acceptance by you, will serve as an amendment and clarification of the APA [asset purchase agreement]."

Soo and the Trustee also executed a stock power on February 19, 1985 which stated:

> For value received, Richard B. Ogilvie, not personally but solely as Trustee of the Property of the Chicago, Milwaukee, St. Paul and Pacific Railroad Company ("Trustee"), does hereby sell, assign and transfer unto SLRCO, Inc. ____ shares of the Capital Stock of Trailer Train Company (the "Company") standing in the name of _____ on the books of the Company represented by Certificate No. ___, along with all interest of the Trustee in investments in, advances to and receivables from the Company. Trustee does hereby irrevocably constitute and appoint _____ attorney to transfer the stock on the books of the Company with full power of substitution in the premises.

On July 12, 1985, the reorganization court entered Order No. 832 which confirmed the reorganization plan and set September 10, 1985 as the "bar date" for filing post-petition or administrative claims against the Milwaukee Road, the bankruptcy estate and its Trustee in accordance with section 77 of the Bankruptcy Act of 1898 and Bankruptcy Rule 8-401(b)(1) (1979). On September 9, 1985, one day before the deadline, Soo filed a proof of claim alleging the Milwaukee Road was liable to Soo on grounds of "contribution, indemnification, and breach of contract arising out of the asset purchase agreement ... dated April 6, 1984, as amended ("APA"), approved by the court by Order No. 809, dated February 19, 1985."

On November 12, 1985, the reorganization court entered a consummation order (Order No. 866) which released the debtor Milwaukee Road from bankruptcy and discharged and released all claims that were not the subject of timely proofs of claim. The debtor was renamed "CMC Real Estate Corp." on the consummation date, November 25, 1985.

Since the asset purchase agreement did not contain a price term for the sale of the

core rail assets, the parties continued to negotiate the term after the sale was closed. The negotiations continued even after the consummation order was entered and the reorganization proceedings were concluded. The parties eventually reached an agreement on July 31, 1986, which the court approved on September 12, 1986. (Order No. 917). See *In re Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 891 F.2d 159, 161 (7th Cir.1989). Paragraph 5 of the settlement agreement provides that "[u]pon closing, all of Soo Line's proofs of claim filed against the Trustee, the Milwaukee or CMC Real Estate ... are dismissed with prejudice and without costs." Paragraph 13 of the settlement agreement further provided:

CMC Real Estate and Soo Line will continue good faith efforts to reach agreement on matters not resolved by this Settlement Agreement, including the Real Property Agreement and the Allocation Agreement (collectively, "the Agreements"), including matters described at times as "minor accounting adjustments," and that any dispute arising out of the APA and the Agreements that cannot be resolved between the parties will be submitted to the Reorganization Court for resolution pursuant to Orders No. 809, 832 and 866.

■ Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c). Rule 56 further provides that a party opposing a properly supported motion for summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). In performing its role, the court must believe all evidence of the non-movant, and "all justifiable inferences are to be drawn in his favor." *Id.* at 265, 106 S.Ct. at 2519. However, the mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Id.* at 247–48, 106 S.Ct. at 2509–10.

CMC contends it is entitled to summary judgment on count III of the complaint as Soo's claim to the Trailer Train debentures is barred by the statute of frauds. CMC claims there is no factual dispute concerning the applicability of the statute of frauds as the asset purchase agreement, the letter agreement and all related documents lack the necessary price term for the debentures.

■ Under Illinois law, any sale of securities must comply with the statute of frauds set forth in section 8–319 of the Illinois Uniform Commercial Code ("UCC"). Section 8–319(a) provides:

A contract for the sale of securities is not enforceable by way of action or defense unless:

(a) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker, sufficient to indicate that a *contract has been made for sale of a stated quantity of described securities at a defined or stated price.*

810 ILCS 5/8–319 (1991) (emphasis added). The purpose of the statute of frauds is to prevent parties from becoming bound to agreements which they have not made. *Triangle Marketing, Inc. v. Action Industries, Inc.*, 630 F.Supp. 1578, 1581 (N.D.Ill.1986). The statute of frauds also precludes parties from presenting false claims by requiring that certain necessary terms be set forth in writing to evidence the parties' contractual intent. *Meyer v. Logue*, 100 Ill.App.3d 1039, 56 Ill.Dec. 707, 710, 427 N.E.2d 1253, 1256 (1st Dist.1981).

■ Soo purchased the Milwaukee Road's core rail assets pursuant to an asset purchase agreement. The asset purchase agreement, as amended by the letter agreement, does not make any reference to the Trailer Train debentures—much less state the number of debentures to be purchased or their price.

■ Soo contends its claim to the debentures is supported by the stock power where-

in the Trustee agreed to "sell, assign and transfer [to Soo] . . . all interest of the Trustee in investments in, advances to and receivables from the [Trailer Train] Company." A debenture is an unsecured note or bond backed by the general credit of a corporation and represents an advancement to the corporation by the bond or noteholder. Black's Law Dictionary, 401 (6th ed. 1990). While the Trailer Train debentures could conceivably fall within the language of the stock power which refers to "advances to" the Trailer Train Company, the stock power fails to describe the securities to be sold (the debentures) or to state the quantity or price of the debentures as required under section 8–319(a).

Soo argues the statute of frauds does not bar its claim to the debentures under section 8–319(b). Paragraph (b) sets forth several actions which, if taken by the transferee, manifest an intent to purchase. Soo contends section 8–319(b) is applicable because the stock power is a "transfer instruction" which was delivered to and accepted by Soo:

> A contract for the sale of securities is not enforceable by way of action or defense unless:
>
> (b) delivery of a certificated security or transfer instruction has been accepted, or transfer of an uncertificated security has been registered and the transferee has failed to send written objection to the issuer within 10 days after receipt of the initial transaction statement confirming the registration, or payment has been made, but the contract is enforceable under this provision only to the extent of the delivery, registration, or payment.

810 ILCS 5/8–319(b). The Illinois General Assembly amended Section 8–319(b) in 1987.[1] Sections 12–101 and 12–102 of Public Act 85–997 provide that the amendment would take effect on January 1, 1988 and that all trans-

actions entered into after December 31, 1987 would be subject to the amendment. Because the alleged contract for the debentures arose in 1985, this amendment to the UCC is inapplicable.

■ Assuming arguendo that the amendment is applicable, Soo's claim is still precluded. In making its argument, Soo ignores the UCC's definition of "instruction" which is "an order to the issuer of an uncertificated security requesting that the transfer, pledge, or release from pledge of the uncertificated security specified therein be registered." 810 ILCS 5/8–308(4). Here, the stock power states nothing about ordering the issuer to register the transfer of the uncertificated security. In referring to the stock power as a "transfer instruction," Soo ignores the purpose and function of the document. As its name suggests, the stock power merely empowers Soo to direct Trailer Train to transfer its stock from the Trustee to Soo for voting rights purposes. See Black's Law Dictionary 1418 (6th ed. 1990).

Section 8–308(4) further makes transfer instructions applicable only to transactions involving uncertificated securities. The UCC, however, defines debentures as certificated securities. See 810 ILCS 5/8–102(1)(a). Since debentures are certificated securities, the provisions of section 8–319(b) dealing with uncertificated securities—delivery of the transfer instruction or registration of the transfer—are inapplicable to the Trailer Train debentures. Pre-amendment or amended Section 8–319(b) would be applicable only if CMC delivered the debentures to Soo or received payment for the debentures from Soo. There was neither delivery nor payment in this case.

In attempting to avoid its lack of payment for the debentures, Soo argues that the total amount it paid the Trustee under the asset purchase agreement included the debentures.

---

1. Pre-amendment Section 8–319, which applied to transactions validly entered into after July 31, 1961 and before January 1, 1988, provided as follows:

A contract for the sale of securities is not enforceable by way of action or defense unless:

. . . . .

(b) delivery of the security has been accepted or payment has been made, but the contract is enforceable under this provision only to the extent of such delivery or payment.

Soo in effect creates its own rule for construing the asset purchase agreement and characterizes it as the "all or nothing principle." Nowhere does the asset purchase agreement state that the Trustee must convey "all or nothing."

■ Soo's argument ignores established rules of contractual interpretation. Perhaps the most basic rule of contract interpretation is that the intent of the parties is best determined by viewing the language of the contract as a whole. See *Wikoff v. Vanderveld*, 897 F.2d 232, 238 (7th Cir.1990). If the language of the contract unambiguously provides an answer to the question of intent, then the inquiry is over. *Id.* at 238, citing *Airline Stewards & Stewardesses Ass'n, Local 550 v. American Airlines, Inc.*, 763 F.2d 875, 878 (7th Cir.1985). The letter agreement explicitly provides for Soo's purchase of 500 shares of Trailer Train common stock for $1,500,000. Paragraph four of the letter agreement provides:

> Soo and SLRCO agree to purchase as of the Closing all of the equity interest of the Trustee in Trailer Train Company ("Trailer Train"), consisting of 500 shares of Trailer Train common stock. The purchase price for the stock is $1,500,000, payable by wire transfer of immediately available funds within [one] business day of immediately following the Closing. Exhibits E and E–1 to the APA are revised in accordance with the provisions of this Paragraph 4.

Given the specificity of this language and the agreement's failure to even mention the debentures, the parties clearly intended that the Trustee only convey part of his interest in the Trailer Train Company—500 shares of common stock for $1,500,000. The language of the letter agreement further provides that the agreement "will serve as an amendment and clarification of the APA [asset purchase agreement]." The stock power contains no such language stating that the stock power is an amendment to or clarification of the asset purchase agreement. See *Braeside Realty Trust v. Cimino*, 133 Ill.App.3d 1009, 89 Ill. Dec. 25, 27, 479 N.E.2d 1031, 1033 (1st Dist. 1985) ("The language used in the contract is the most reliable indicator of the parties'

intent.... There is a strong presumption against conditions that could have been easily included by the parties as terms of the contract but were not.")

Because the stock power cannot satisfy the statute of frauds, the court determines that the stock power cannot be construed as a contract for the sale of the Trailer Train debentures. The court also determines that there is no factual dispute that the asset purchase agreement, letter agreement and all related documents do not contain the necessary price term for the debentures and that Soo's claim to the debentures is barred by the statute of frauds. Summary judgment is granted for CMC on count III of the complaint.

## II. Breach of Duty to Defend

Count VIII of CMC's counterclaim seeks damages for Soo's alleged breach of its duty to defend CMC in connection with two state court personal injury lawsuits brought against CMC in Dane County Circuit Court, Wisconsin: *Fillner v. Milwaukee Road*, No. 88 CV 6085 ("*Fillner*") and *Heritage Mutual Life Ins. Co. v. Milwaukee Road*, 88 CV 6358 ("*Heritage*").

CMC and Soo entered into a litigation allocation agreement as part of its July 24, 1986 settlement agreement. Paragraph 3 of the allocation agreement placed responsibility upon Soo to "assume, defend against, discharge and pay ... each of the liabilities and obligations that may arise [from certain claims relating to the Core Rail Assets.]"

The *Fillner* and *Heritage* lawsuits arose after the closing of the asset purchase agreement and involved personal injuries that occurred on rail lines relating to the core rail assets. Soo acknowledged its responsibility to defend CMC in both actions and retained counsel on CMC's behalf. Soo subsequently failed to timely answer the complaint in both actions. The *Fillner* and *Heritage* plaintiffs then filed motions for default judgment. After Soo failed to appear on CMC's behalf at a scheduled court conference in the *Heritage* action, the court granted plaintiff's motion for default judgment against CMC. Soo further failed to inform CMC that a motion for

a default judgment had been filed until after the court entered the default. In addition, a motion for default judgment was pending before the Wisconsin circuit court in *Fillner*.

CMC claims that in order to protect its interest in the *Heritage* case, it retained two law firms, Jenner & Block of Chicago and Foley & Lardner of Madison, Wisconsin, as its counsel in addition to counsel retained by Soo. CMC alleges it incurred $39,996.00 in legal fees to vacate the default judgment in *Heritage* and to defend the motion for default judgment in *Fillner*. This court is unable to ascertain the extent to which Foley & Lardner and Jenner & Block were involved in briefing the motion to vacate the default judgment in *Heritage* although the affidavit of Lawrence S. Adelson, General Counsel for CMC, attests to both firms' involvement. However, it was counsel retained by Soo who ultimately vacated the default judgment and obtained CMC's dismissal in *Heritage*.

According to the transcript of proceedings in *Fillner*, Foley & Lardner filed affidavits and briefs in opposition to the motion for default judgment. Judge Jones limited Foley & Lardner's involvement in *Fillner* to responding to the motion for default judgment and determined that Foley & Lardner would not be allowed to submit materials on CMC's behalf in future proceedings. After the court denied plaintiff's motion for default judgment, Soo then obtained CMC's dismissal and substituted Soo as the proper party defendant.

CMC contends it is entitled to summary judgment on count VIII of its counterclaim as Soo breached its duty to defend CMC and placed CMC at risk of substantial liability. In response, Soo claims there was no breach as Soo never denied its contractual duty to defend CMC or stopped defending CMC in the lawsuits. Soo also argues that CMC would not be responsible for paying any judgment entered against it as Soo was obligated under the allocation agreement to "pay ... each of the liabilities and obligations that may arise." Soo notes that if anyone is entitled to summary judgment on the duty to defend issue, it is Soo.

CMC cites to *Holt v. Utica Mutual Insurance Company*, 157 Ariz. 477, 759 P.2d 623

(1988) in support of its argument. There, plaintiff Holt paid an insurance agent for automobile liability coverage. The agent accepted the money but failed to either procure the requested coverage or inform plaintiff that the policy had not been issued. At the time of the incident, the agent had professional errors and omissions ("E & O") coverage under a policy issued by Utica Mutual Insurance Company ("Utica"). Plaintiffs subsequently brought a malpractice action against the agent for his failure to obtain coverage. The agent did not inform Utica of the E & O action or request Utica to defend him. Plaintiffs' attorney then sent Utica a copy of the malpractice action against the agent and also asked Utica to defend plaintiffs in a personal injury action arising out of an automobile accident involving plaintiff's son. Utica did not respond.

The Arizona Supreme Court reversed the trial court's grant of summary judgment for plaintiff and determined that it could not decide as a matter of law whether Utica's conduct would reasonably have been taken as a manifestation that Utica had no intent to perform under the terms of its liability contract with the agent. The court explained that, in general, a trier of fact must determine whether a liability insurer has breached its duty to defend and that all possible inferences from Utica's behavior must be resolved by the trier of fact at trial. The court remanded the case for trial on the matter.

Given that the Arizona Supreme Court ultimately held that the alleged breach of duty in *Holt* should be resolved by the trier of fact, it is difficult to see how this case supports CMC's motion for summary judgment. CMC also cites to *Russo v. Rochford*, 123 Misc.2d 55, 472 N.Y.S.2d 954 (1984), for the proposition that the duty to defend includes the responsibility to conduct a defense with due care, and that negligence in performing this duty may lead to liability and resulting damages. However, in addressing this issue, *Russo* focused on whether a primary insurer owes a direct fiduciary obligation to the excess insurer to exercise good faith in handling the insured's defense and to safeguard the rights and interests of the excess carrier. This case is easily distin-

guishable from *Russo* as it does not involve insurance companies—much less a dispute between primary and excess insurers.

In resolving CMC's motion for summary judgment on the issue of whether Soo breached its duty to defend, the court will look to the reasoning articulated by Judge Jones and Judge Krueger in resolving the *Fillner* motion for default judgment and the *Heritage* motion to vacate. In *Fillner*, Soo argued that although it filed CMC's answer approximately four months late[2], a courtesy agreement was in effect which extended the time for filing the answer. Although Judge Jones found that no courtesy agreement existed, he noted that the parties had engaged in extensive, ongoing settlement negotiations, propounded discovery and taken depositions of several Soo employees. As a result, Judge Jones found the failure to file the answer within the statutory period to be excusable neglect and denied the motion for default judgment:

> 'Excusable neglect' is defined as 'neglect which might have been the act of a reasonably prudent person under the same circumstances.' *Oostburg [State Bank v. United Savings & Loan Association]*, 125 Wis.2d [224] at 240 [372 N.W.2d 471]. 'Excusable neglect is not synonymous with neglect, carelessness, or inattentiveness.' *Id.* at 239 [372 N.W.2d 471], quoting *Giese v. Giese*, 43 Wis.2d 456, 462 [168 N.W.2d 832 (1969)]. I am satisfied that a reasonably prudent person who was in frequent contact with opposing counsel and cooperated in discovery might fail to file its answer in the hope of settling in advance some of the issues with regard to proper parties to the action. In light of the frequent communications between opposing counsel, a reasonably prudent person might also believe that opposing counsel acquiesced in the delay. The record makes it clear that defendant's counsel was not careless or inattentive. The record is replete with instances of communications

between the parties regarding the merits of the case and discovery requests. In addition, the defendants took prompt remedial measures immediately after being served with notice of the motion [for default judgment].[3]

In the *Heritage* action, Judge Krueger granted Soo's motion to vacate the default judgment primarily based upon the perception between counsel that a courtesy agreement existed. More importantly, Judge Krueger viewed the conduct of Soo's counsel as amounting to excusable neglect: "I think what excusable neglect means is we are all human and we all make mistakes and we have to not have the entire house of cards tumble."[4]

■ Although not dispositive of the issue of whether Soo breached its duty to defend, the "excusable neglect" standard is instructive in determining whether a reasonable jury would return a verdict for CMC based upon the evidence presented. Because the actions of Soo's retained counsel were found to be the result of excusable neglect in both the *Heritage* and *Fillner* actions, genuine issues of material fact exist as to whether Soo breached its contractual duty to defend CMC. CMC's reasonableness in retaining two law firms to respond to the motion for default judgment and motion to vacate is another issue to be determined at trial. CMC's motion for summary judgment on count VIII of its counterclaim is denied.

### III. *Eighth Street Coach Yard and Minneapolis Lite Yard*

In counts III and IV of its counterclaim, CMC seeks to recover the fair rental value of two rail yards located in Minnesota: the Eighth Street Coach Yard ("Coach Yard") and the Minneapolis Lite Yard ("Lite Yard"). CMC claims Soo is liable for trespass since it occupied the yards from February 19, 1985 to December 31, 1987 without CMC's autho-

---

2. Pursuant to Wisconsin law, the answer is due within twenty (20) days of service of the complaint and summons.

3. Memorandum Decision, Branch III, Circuit Court, Dane County, Wisconsin, May 10, 1989.

4. Transcript of Proceedings, Branch VII, Circuit Court, Dane County, Wisconsin, May 18, 1989.

**634**

rization. CMC has moved for partial summary judgment on the issue of liability.

Pursuant to the asset purchase agreement, Soo acquired certain assets of the Trustee through original deeds dated February 19, 1985. Initially, Soo and CMC had numerous disputes over which rail properties were to have been conveyed to Soo by the Trustee due to inaccuracies in the original deeds. As part of the September 12, 1986 settlement agreement, Soo and the Trustee executed a real property agreement which settled the disputes over the rail lines and provided for the correction of deeds as soon thereafter as practical. Soo and CMC continued to negotiate the deeds until they agreed on corrective deed 29, dated October 7, 1987.

From February 19, 1985 until October 7, 1987, Soo used the Lite Yard for storing equipment. In addition, Soo used portions of the Coach Yard for staging trains, short term storage of trains, servicing locomotives as well as for steel and plastic pellet unloading operations. Soo ultimately abandoned the yards by December 31, 1987.

 Under Minnesota law, plaintiff must prove two essential elements to maintain an action for trespass to land: (1) plaintiff's right of possession in the property; and (2) defendant's wrongful and unlawful entry upon such possession.[5] *All American Foods, Inc. v. County of Aitkin,* 266 N.W.2d 704, 705 (Minn.1978).[6] However, no trespass is committed if "permission or consent to do the acts complained of" is given. *Meixner v. Buecksler,* 216 Minn. 586, 13 N.W.2d 754, 756 (1990). In addition, consent to enter another's land may be implied from the circumstances surrounding the occupancy or use. *Id.* Silence alone does not support an inference of consent. *Northern States Power Co. v. Franklin,* 265 Minn. 391, 122 N.W.2d 26, 30 (1963).

Soo contends that CMC is not entitled to partial summary judgment because CMC impliedly consented to Soo's entry, occupancy and use of the yards. Soo claims CMC has presented no evidence to suggest Soo lacked authority to use the yards. From February 19, 1985 to October 7, 1987, CMC made no demand upon Soo to vacate the Coach or Lite Yards. In support, Soo references the depositions of CMC vice president and general counsel, Lawrence S. Adelson, and CMC vice president of sales, Raymond A. Lamberty. Adelson testified that Lamberty would have been the individual to communicate the demand for rent to Soo. However, Lamberty testified as follows:

Q: Between November of 1985 and the end of 1987, did you or anyone acting on your behalf or reporting to you make a written demand for compensation for the use of the 8th Street Coach Yard on the Soo Line?

A: Not that I recall.

Soo notes the only evidence of a demand by CMC to vacate the yards is an October 7, 1987 letter from Kenneth R. Reed, CMC's manager of engineering, to G.A. Nilsen, manager of engineering at Soo. The letter notifies Soo that CMC had sold the Coach Yard rail lines and commenced "advertising for bids for the removal of all rail, ties, and other track materials from both properties." The letter briefly noted that both yards "have been used by Soo without agreement, easement lease or other authorization," but made no demand for payment of rent due. According to Soo, CMC's failure to make any demand prior to the October 7, 1987 letter evinces CMC's recognition, acceptance and consent to Soo's occupancy and use of the yards.

In rebuttal, CMC points to the August 5, 1992 deposition of Lawrence Adelson. Adelson stated that CMC told Soo to either pay

---

5. Count IV of CMC's counterclaim fails to allege an element of an action for trespass to land. Unlike count III which alleges that Soo occupied the Coach Yard "without a right to do so," count IV only alleges that Soo "occupied" the Lite Yard. CMC's failure to allege that Soo's occupancy of the Lite Yard was wrongful, unauthorized or unconsented to by CMC warrants denial of CMC's motion for partial summary judgment

on count IV as CMC has failed to adequately plead an action for trespass.

6. In *Garvis v. Employers Mutual Casualty Co.,* 497 N.W.2d 254 (Minn.1993), the Minnesota Supreme Court noted that the trespass must also be intentional. *Id.* at 259. See also Prosser and Keeton on Torts, § 13 at 73 (5th ed. 1984).

or vacate the yard "during the course of negotiations that followed the closing of the sale to the Soo Line." (Adelson deposition at 10). However, when asked the following questions pertaining to any record of that request being made, Adelson responded accordingly:

Q: Okay. Do you have any records regarding when that would have been, when the request to vacate or pay rent would have been?

A: No.

Q: Are there any records that the company has that would provide that information?

A: I don't know.

Q: Have you made an investigation to determine whether there are such records?

A: No.

Q: Have you requested that anyone make an investigation to determine when?

A: No.

(Adelson deposition at 10).

In addition, Soo points to the Trustee's transfer of certain Coach Yard track leases as giving rise to CMC's implied consent to Soo's use of the Coach Yard. According to the deposition of Edwin Gilbert Tyckoson, Jr., Soo's director of real estate management, the leases were transferred to Soo by the Trustee's office since "[t]rack leases were part of the operating railroad." (Tyckoson deposition at 20).

 Soo has presented sufficient evidence to show that a genuine issue of material fact exists as to whether Soo was required to obtain CMC's permission to occupy and use the yards. Nevertheless, even if this court assumes that Soo was required to obtain CMC's consent and that CMC's silence is not sufficient to support an inference of consent, Soo has shown that a genuine issue of material facts exists as to whether CMC impliedly consented to Soo's occupancy and use of the yards. First, the disputes over the inaccuracies in the original deeds remained unresolved until the deeds were corrected on October 7, 1987. Until that date, Soo had occupied and used both yards for over two years without any demand by CMC

to pay rent or vacate the yards. Soo stored equipment at the Lite Yard and used portions of the Coach Yard for storing trains and servicing locomotives. Most importantly, the inability of CMC to pinpoint a date earlier than October 7, 1987 supports the inference that CMC made no earlier request to Soo to either pay rent or vacate the yards. CMC's implied consent may also be inferred from the Trustee's transfer of track leases to Soo. CMC's motion for partial summary judgment on counts III and IV of its counterclaim is denied.

### IV. *Beer, Rockford and C & E Lines*

Count VII of CMC's counterclaim requests this court to enforce Order 968 entered by the reorganization court in case number 77 B 8999, which directs Soo to purchase or lease portions of the Beer, Rockford Terminal ("Rockford") and Chicago and Evanston ("C & E") lines from CMC. CMC has moved for partial summary judgment as to liability only on count VII. Soo has moved to dismiss this count without prejudice.

 The issue of enforcement of a prior court order, which was entered in the Milwaukee Road bankruptcy reorganization, is more properly raised as a contempt matter in that action than as a claim in this action. Soo's motion to dismiss is granted. The court suggests that CMC file a motion for rule to show cause why Soo should not be held in contempt of court for failure to comply with the August 10, 1988 order entered by Judge Prentice H. Marshall in case number 77 B 8999.

ORDERED: CMC's motion for summary judgment on count III of Soo's amended complaint is granted. CMC's motion for summary judgment on counts III, IV, VII and VIII of its counterclaim is denied. Soo's motion to dismiss count VII of CMC's counterclaim without prejudice is granted.