CERTAIN UNDERWRITERS AT LLOYD'S LONDON AND COMPANIES IN INTEREST, SUBSCRIBING TO COVER NOTES RLJ2197 AND RLJ2197A, Plaintiff,

v.

THE FIDELITY AND CASUALTY INSURANCE COMPANY OF NEW YORK, Defendant.

No. 89 C0 0876.

United States District Court, N.D. Illinois, E.D.

April 6, 1992.

---

Dwight B. Palmer, Jr., Keck, Mahin & Cate, Stanley C. Nardoni, Karon, Savikas & Horn, Ltd., Chicago, Ill., for plaintiff.

Henry R. Daar, Clausen, Miller, Gorman, Caffrey & Witous, P.C., Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

LINDBERG, District Judge.

Plaintiff, Certain Underwriters at Lloyd's London and Companies In Interest ("Underwriters"), brought this tort action against defendant, The Fidelity and Casualty Insurance Company of New York ("Fidelity"), for wrongful refusal to settle an underlying product liability suit against the mutual insured, Dresser Industries, Inc. ("Dresser"). Fidelity moved for summary judgment. In the course of the briefing of the motion for summary judgment, Fidelity moved to strike a portion of plaintiff's response. The Magistrate Judge recommended that both the motion to strike and the motion for summary judgment be denied. This court accepts that portion of the report and recommendation recommending denial of the motion to strike and rejects that portion of the report and recommendation recommending denial of the motion for summary judgment. 28 U.S.C. § 636(b)(1)(B) (1988); Fed.R.Civ.P. 72(b).

## FACTUAL BACKGROUND

From November 1, 1978, until November 1, 1979, Fidelity provided Dresser with primary liability insurance for personal injury claims up to $1,000,000 per occurrence. During the same period, Underwriters provided Dresser with excess liability insurance of $20,000,000 for personal injury claims. Underwriters' excess policy obligation arose only upon payment of Fidelity's $1,000,000 primary policy limit.

Terrence J. Fahy ("Fahy") brought a product liability action against Dresser because of an incident on August 23, 1979. Dresser (which is not a party to the instant action) refused to settle the Fahy lawsuit, based on its conclusion that a trial would result in a directed verdict or a jury verdict in its favor. The jury decided against Dresser and awarded $3,000,000 to Fahy. Dresser appealed and ultimately the Missouri Supreme Court affirmed the jury's verdict. *Fahy v. Dresser Industries*, 740 S.W.2d 635 (Mo.1987), *cert. denied* 485 U.S. 1022, 108 S.Ct. 1576, 99 L.Ed.2d 891 (1988). Fidelity paid $1,000,000 to Fahy according to the terms of Fidelity's primary insurance contract with Dresser. Dresser then paid the remaining $2,000,000 to Fahy. Under a reservation of rights, Underwriters indemnified Dresser for $1,980,000.

Fidelity's primary policy with Dresser provided:

> With respect to such insurance as is afforded by this policy, the Company [Fidelity] shall:
>
> A. Defend any suit against the Insured alleging such personal or bodily injury or injury to or destruction of property and seeking damages on account thereof, even if such suit is groundless, false, or fraudulent; but the Company may make such investigation, negotiation, and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.

Dresser entered a Claims Service Contract with Underwriters Adjusting Company ("UAC"). In relevant part, the Claims Service Contract provided that UAC will examine all reports Dresser received pertaining to losses from product liability claims. The contract further provided:

> *UAC shall have full authority and control in all matters pertaining to the adjustment, handling, investigation, administration of claims and losses within the discretionary settlement authority limit and may make such adjustment or settlement of claims within discretionary settlement authority limit which in its judgment it deems proper unless Dresser notified UAC to the contrary on any specific claim.*
>
> *UAC agrees to obtain the prior approval of Dresser before agreeing to the payment of claims or losses (including allocated loss expenses) in excess of the settlement authority limit specified below:*
>
> > *(a) Products Liability –0–*
> > (b) All others applicable $10,000

(emphasis added)

Fidelity is one of the Continental Insurance Companies and UAC is the claims facility for the Continental Insurance Companies. According to the underwriter in charge of Fidelity's policy with Dresser, when Fidelity issued its policy, Fidelity knew that Dresser was going to execute a Claims Service Contract with Fidelity. The underwriter "had no disagreement with Fidelity's insured entering into a Claims Servicing Contract with UAC as the same is not unusual with large, sophisticated insureds such as Dresser." Neither the underwriter nor anyone else to the underwriter's knowledge at Fidelity had any objections to the Claims Service Contract between UAC and Dresser.

## DISCUSSION

Underwriters alleges that Fidelity owed Underwriters a direct duty of good faith and fair dealing. This duty included an obligation to settle the Fahy claim within its policy limits, thus preventing unreasonable exposure of Underwriters to liability for a judgment exceeding Fidelity's primary policy limits.

Fidelity argues that as a matter of law, it owed no duty to Underwriters beyond its duty to Dresser. Under the equitable subrogation theory or under the direct duty theory, Fidelity did not breach a duty to settle the Fahy suit within the primary policy limits because Fidelity lacked control over the Fahy suit. Dresser had exclusive control of the Fahy claim because of the Claims Service Contract. Because Dresser insisted on litigating the Fahy claim and refused to settle, Dresser had no claim against Fidelity for bad faith failure to settle within the primary policy limits. Without Dresser having a claim, Underwriters cannot be subrogated to any rights against Fidelity. In addition when a primary and excess carrier's mutual insured has the right to refuse to settle a claim and refuses to settle a claim, an excess carrier may not bring a direct action against the primary carrier for an alleged breach of a duty to settle within the primary limits. Consequently, Fidelity urges this court to grant its motion for summary judgment.

A court will grant summary judgment if it is shown that there is no genuine issue about any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). The movant bears the burden of establishing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). According to General Rule 12(m) of this court, on a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, the movant shall serve and file "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law...." U.S.Dist.Ct., N.D.Ill., Gen.R. 12(m). In response a nonmovant may not rest upon the mere allegations or denials but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). General Rule 12(n) of this court further provides that when responding to the movant's statement the nonmovant must make "specific reference to the affidavits, parts of the record, and other supporting materials relied upon...." U.S.Dist.Ct., N.D.Ill., Gen.R. 12(n).

When determining whether summary judgment should be granted the court must consider both the substantive law and whether a reasonable jury could find for the nonmovant. *Central States, S.E. and S.W. Areas Pension Fund v. Sloan*, 902 F.2d 593, 596 (7th Cir.1990) (citing *Checkers, Simon & Rosner v. Lurie Corp.*, 864 F.2d 1338, 1344 (7th Cir.1988)). When making this determination, a court will draw all reasonable inferences from the facts in the light most favorable to the nonmovant. *Painewebber v. Ras*, 767 F.Supp. 930, 931 (N.D.Ill.1991) (citing *Hermes v. Hein*, 742 F.2d 350, 353 (7th Cir.1984)). But when interpreting Rule 56(e), this Circuit has held that the nonmovant to a summary judgment motion cannot rely upon a mere

denial contained in its pleading. *Instituto Nacional de Commercializacion Agricola v. Continental Illinois Nat'l Bank & Trust*, 858 F.2d 1264, 1271 (7th Cir.1988). Without evidence rebutting the movant's undisputed facts, the court must take as true the sworn, uncontested testimony supporting the motion for summary judgment. *Baldini v. Local Union No. 1095*, 435 F.Supp. 264, 268 (N.D.Ind.1977), *aff'd in part and rev'd in part on other grounds*, 581 F.2d 145 (7th Cir.1978).

Initially, a choice of law question must be discussed. The three possible jurisdictions whose law might control are identified by the parties as Illinois, Missouri, and Texas. Underwriters' possible theories of liability against Fidelity in these contact states include the equitable subrogation doctrine and the direct duty doctrine.

█ A federal court sitting in diversity must look to the forum state for substantive law including choice of law rules. *International Adm'rs v. Life Ins.*, 753 F.2d 1373, 1376 n. 4 (7th Cir.1985). (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 71–80, 58 S.Ct. 817, 818–823, 82 L.Ed. 1188 (1938) and *Klaxon Co. v. Stentor Elec. Mfg.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477). Therefore this court must look to Illinois to determine Illinois' choice of law rules. Illinois has adopted the "most significant relationship" test for determining choice of law for tort cases. *FMC Corp. v. Capital Cities/ABC, Inc.*, 915 F.2d 300, 302 (7th Cir.1990). Generally, in a tort action, the two most important contacts are where the conduct leading to the injury occurred and where the injury itself occurred. *Miller v. Long–Airdox Co.*, 914 F.2d 976, 978 (7th Cir.1990).

█ Seemingly, it appears necessary to decide the location where Fidelity made its decision not to settle the Fahy claim against Dresser. However, that is not necessary here. "Conflict rules are applied only when a difference in law makes a difference to the outcome." *International Adm'rs v. Life Ins.*, 753 F.2d 1373, 1376 n. 4 (7th Cir.1985). (citing *In re Air Crash Disaster Near Chicago, Illinois*, 644 F.2d 594, 610–11 (7th Cir.), *cert. denied sub*

*nom. Lin v. American Airlines*, 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 187 (1981)).

█ Here, irrespective of whether Underwriters relies upon the equitable subrogation theory or the direct duty theory, the law does not afford Underwriters any recovery. Fidelity had no legal right to settle the claim made against Dresser within the primary policy limits, therefore Fidelity's failure to settle the claim could not breach any duty to Underwriters under either theory. As a result, it is not necessary for this court to determine which state's law applies to this controversy, and whether that state's law affords recovery under either or both possible theories, because the outcome is the same under either theory.

To determine whether Fidelity can prevail under the equitable subrogation theory or the direct duty theory, it is necessary to determine what authority Fidelity had over the Fahy claim.

█ A contract modification is a change in the contract that introduces new elements into the details of a contract and cancels others while leaving the general purpose and effect of the contract intact. *Highway Equipment Co. v. Caterpiller*, 707 F.Supp. 954, 959 (S.D.Ohio 1989), *aff'd*, 908 F.2d 60 (6th Cir.1990) (citing *Chicago Coll. of Osteopathic Med. v. George Al Fuller Co.*, 776 F.2d 198, 208 (7th Cir. 1985)). A contract may only be modified with the assent of the parties to the contract. 6 Arthur Linton Corbin, Corbin on Contracts § 1293 (1962).

█ Parties may be bound to promises by implicit or explicit assent. *Holbrook v. Pitt*, 643 F.2d 1261, 1271 (7th Cir.1981). Parties may implicitly consent through their conduct. *Centerre Bank v. New Holland Div. of Sperry*, 832 F.2d 1415, 1422 (7th Cir.1987). See also *Broad, Vogt and Conant v. Harnischfeger Corporation*, 1990 WL 205452, 1990 U.S.Dist. LEXIS 16935 (N.D.Ill.1990), *Verson Wilkins Ltd. v. Allied Products*, 723 F.Supp. 1, 16 (N.D.Ill.1989), *Lescha Maschinenfabrik GmbH v. GSC Properties*, 719 F.Supp. 715, 719 (N.D.Ill.1989), *Rubloff, Inc. v. Julius*

*Trump,* 1987 WL 12913, 1987 U.S.Dist. LEXIS 5625 (N.D.Ill.1987), *Walter E. Heller and Co. v. James Godbe Co.,* 601 F.Supp. 319, 321 (N.D.Ill.1984), *Superior Bedding v. Serta Assocs.,* 353 F.Supp. 1143, 1146 (N.D.Ill.1972), *Employers' Liability Assurance, v. Enos Coal,* 457 F.2d 402, 406–407 (7th Cir.1972), *Crane v. Gas Screw Happy Pappy,* 367 F.2d 771, 773 (7th Cir.1966), *cert. denied sub nom. Borrowdale v. Reuland,* 386 U.S. 959, 87 S.Ct. 1029, 18 L.Ed.2d 108 (1967). However, knowledge must be present for implied consent. *City Messenger of Hollywood v. City Bonded Messenger Serv.,* 254 F.2d 531, 537 (7th Cir.1958). Additionally, silence can give rise to implied consent which constitutes an agreement. *Uhlmann Grain v. Fidelity and Deposit,* 116 F.2d 105, 108 (7th Cir.1941).

Dresser's Claim Service Contract with UAC provided that Dresser shall have the exclusive authority to settle all product liability cases against it.[1] Yet, Fidelity's primary policy provided that Fidelity would defend all suits against Dresser that the policy covered and Fidelity could settle claims it defended. These contract provisions are inconsistent. The issue presented is whether Dresser's contract with UAC modified Fidelity's primary policy.

■ Underwriters argues that Fidelity admitted that Fidelity's primary policy was the only document controlling its insurance to Dresser. In Fidelity's Response to Underwriters' Request for Admissions Fidelity stated, "The policy affords Dresser $1 million in coverage pursuant solely to its terms, provisions, conditions, limitations, exclusions, and not otherwise." By this statement, Fidelity admitted an obligation to pay $1,000,000 in accordance with the primary policy. This statement did not constitute an admission that the Claims Service Contract had no force and effect. To view this statement according to Underwriters' contention would be inconsistent with the briefs and pleadings before this court.

In Underwriters' General Rule 12(m) Statement, Underwriters merely denied that UAC and Fidelity are related companies as they both are owned by Continental Insurance Companies. Underwriters did not support its denial with any specific reference to the affidavits, parts of the record, or other supporting materials. Consequently, on the motion for summary judgment this court will take as true Fidelity's statement that UAC and Fidelity are related companies.

Fidelity impliedly consented to the Claims Service Contract between Dresser and UAC that modified the primary insurance contract between Dresser and Fidelity. The conduct and the relationship between the parties shows Fidelity's implied consent. UAC and Fidelity are related companies. Fidelity is one of the Continental Insurance Companies and UAC is the claims facility for the Continental Insurance Companies. The underwriter assigned to Fidelity's primary policy with Dresser knew and had no disagreement with Dresser entering into a Claims Service Contract with UAC. No one else at Fidelity, to the underwriter's knowledge, had any objections to the Claims Service Contract between UAC and Dresser.

The Magistrate Judge unreasonably inferred the possibility of collusion between Fidelity and Dresser. Underwriters introduced no evidence of any such collusion. Fidelity was under no obligation to notify Underwriters of the modification of the primary insurance contract because Underwriters was not a party to that contract. The primary carrier does not have an affirmative duty to disclose changes in the primary insurance contract to the excess insurer. Fidelity did disclose Dresser's arrangement with UAC when Underwriters requested such information. Underwriters could have contracted with Dresser to notify Underwriters of any changes in the pri-

---

1. The Claims Service Contract states that it was effective November 1, 1978, but bears a written signature dated January 16, 1979. Since the claim in question relates to an accident on August 23, 1979, several months after the signature date, the difference between the stated contract date and the signature date is of no consequence. Regardless, the Claims Service Contract came into effect before the accident occurred.

mary insurance contract or contracted that no changes could be made in the primary insurance contract without Underwriters' approval. Underwriters did not do so.

Fidelity impliedly assented to the Claims Service Contract between Dresser and UAC. This court finds that the Claims Service Contract modified the primary insurance contract between Fidelity and Dresser. Consequently, Dresser by contract had sole authority to settle products liability claims against it.

It must be determined whether Underwriters can maintain a cause of action against Fidelity for failure to settle the Fahy suit against Dresser given the fact that Dresser had exclusive control over the Fahy suit.

■ Though no privity of contract between the primary and excess carriers exists, under the doctrine of equitable subrogation an excess insurance carrier can maintain a cause of action against a primary insurance carrier for tortious conduct regarding a claim against their mutual insured. *Russo by Russo v. Rochford,* 123 Misc.2d 55, 472 N.Y.S.2d 954, 958 (Sup. 1984). Equitable subrogation is a legal fiction where a person who pays a another's debt is substituted or subrogated to all the rights and remedies of the other party. *Commercial Union Ins. v. Medical Protective,* 426 Mich. 109, 393 N.W.2d 479, 482 (1986). Accordingly, the excess insurer would step into its insured's shoes and acquire the insured's cause of action against the primary carrier. *Certain Underwriters of Lloyd's v. General Accident Ins.,* 909 F.2d 228, 232 (7th Cir.1990). The primary carrier owes no greater duty to an excess carrier than the primary carrier owes to its insured. *Twin City Fire Ins. v. Superior Ct. of Arizona,* 164 Ariz. 295, 296, 792 P.2d 758 (1990). If the insured does not have a cause of action against the primary insurer, then the excess insurer is also precluded from bringing a bad faith claim against the primary carrier. *Puritan Ins. v. Canadian Universal Ins.,* 775 F.2d 76 (3rd Cir.1985).

■ Dresser lacks a cause of action against Fidelity under an equitable subrogation theory because it is undisputed that Dresser would not settle the Fahy claim. Since Fidelity breached no duty to Dresser, Underwriters has no cause of action against Fidelity for failure to settle the Fahy claim. Therefore applying the doctrine of equitable subrogation, the law does not afford Underwriters recovery.

■ Apart from the principles of equitable subrogation, an excess carrier in some jurisdictions can maintain a cause of action for the primary carrier's breach of a direct duty to the excess carrier though no privity of contract exists between the insurers. *Hartford Accident and Indemnity v. Michigan Mutual Ins.,* 462 N.Y.S.2d 175, 93 A.D.2d 337, 342 *aff'd* 61 N.Y.2d 569, 475 N.Y.S.2d 267, 463 N.E.2d 608 (1984). Public policy justifies imposing a direct duty because this duty gives primary carriers incentive to settle claims against the mutual insured when the settlement prospects are near or over its policy limits. *Estate of Penn v. Amalgamated General Agencies,* 148 N.J.Super. 419, 372 A.2d 1124, 1127 (1977) and *Ranger Ins. v. Home Indemnity,* 714 F.Supp. 956, 961 (N.D.Ill.1989). In addition, if the primary carrier is not under this duty to accept reasonable offers because of an excess insurer's existence, the excess insurer would have additional financial liability that would be reflected in increased premiums. *Id.*

■ Under the direct duty theory, the primary insurer owes the excess insurer a direct duty of good faith and fair dealing. *Kaiser Foundation Hospitals v. North Star Reinsurance,* 90 Cal.App.3d 786, 153 Cal.Rptr. 678, 682 (1979). The primary carrier owes a direct duty to the excess carrier to attempt to settle an action against the mutual insured within its primary coverage limit. *American Centennial Ins. v. American Home Assurance,* 729 F.Supp. 1228, 1232 (N.D.Ill.1989).

■ Underwriters cannot maintain a cause of action under the direct duty theory. Fidelity had no duty to settle the Fahy claim, because Fidelity lacked the authority to settle the Fahy claim. Fidelity impliedly consented to the Claims Service Contract

that modified its primary insurance contract with Dresser. This Claims Service Contract gave Dresser exclusive control over product liability claims against it. Therefore, Fidelity lacked control over product liability claims against Dresser. Since Fidelity could not force Dresser to settle, Fidelity could not have breached any duty to settle owed to Underwriters. As a matter of law the primary insurer cannot have a direct duty to the excess insurer to do that which the primary insurer has no authority to do.

ORDERED: The report and recommendation of the Magistrate Judge is accepted in part and rejected in part.

The portion of the Magistrate Judge's report and recommendation recommending that defendant's motion to strike be denied is accepted and the motion to strike is denied.

The portion of the Magistrate Judge's report and recommendation recommending denial of the defendant's motion for summary judgment is rejected and the motion for summary judgment of defendant is granted. Judgment is entered in favor of defendant and against plaintiff.