**INTERNATIONAL INSURANCE COMPANY, Appellant,**

v.

**DRESSER INDUSTRIES, INC. and Fidelity and Casualty Company of New York, Appellees.**

No. 05–91–01478–CV.

Court of Appeals of Texas, Dallas.

Sept. 17, 1992.

Rehearing Denied Oct. 29, 1992.

Robert D. Allen and Thomas D. Caudle, Dallas, for appellant.

James E. Coleman, Jr., Rebecca P. Adams and Lyndon F. Bittle, Dallas, for appellees.

Before KAPLAN and WIGGINS, JJ., and WARREN WHITHAM [1], J. (Retired Sitting by Assignment).

## OPINION

WARREN WHITMAN, Assigned Justice.

In this action arising under an excess insurance policy, the trial court entered judgment against the appellant-excess carrier, International Insurance Company, and in favor of the appellee-insured, Dresser Industries, Inc., and the appellee-primary carrier, Fidelity and Casualty Company of New York. Initially, International filed a declaratory judgment action against Dresser and Fidelity seeking a declaratory judgment that International was not obligated to pay a claim that Dresser had submitted under an excess insurance policy. The claim arose from a judgment entered against Dresser in a products liability lawsuit (*Snyder*) that International's excess policy covered. International claimed that it was excused from payment because Dresser and/or Fidelity had breached alleged duties to International to settle the underlying lawsuit within the limits of Fidelity's primary policy. Dresser and Fidelity denied International's claims, and Dresser filed a counterclaim asserting International had breached its contract by refusing to pay the excess portion of the judgment. The trial court granted Dresser and Fidelity's motion for partial summary judgment. Thereafter, the trial court decided the remaining issues and entered final judgment in favor of Dresser and Fidelity except as to their claim for attorney's fees, which the trial court denied. Because we find no merit in any of International's points of error or in the denial of attorney's fees to Dresser and Fidelity, we affirm.

## THE ABSENCE OF GENUINE ISSUES OF MATERIAL FACT

In its first point of error, International contends that the trial court erred in granting Dresser and Fidelity's motion for summary judgment. We begin by repeating well-known rules governing the summary judgment practice. The function of a summary judgment is not to deprive a litigant of his right to a full hearing on the merits of any real issue of fact, but to eliminate patently unmeritorious claims and untenable defenses. *Gulbenkian v. Penn,* 151 Tex. 412, 415–16, 252 S.W.2d 929, 931 (1952). The standards for reviewing a motion for summary judgment are well established. As mandated by the Supreme Court of Texas, they are as follows:

1. The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

2. In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true.

3. Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor.

*Nixon v. Mr. Property Management,* 690 S.W.2d 546, 548–49 (Tex.1985). It is not the purpose of the summary judgment rule to provide either a trial by deposition or a trial by affidavit, but rather to provide a method of summarily terminating a case when it clearly appears that only a question of law is involved and that there is no genuine issue of fact. *Gaines v. Hamman,* 163 Tex. 618, 626, 358 S.W.2d 557, 563 (1962). Moreover, when the defendant is the movant, as in the present case, we must be alert to additional rules controlling the summary judgment practice. The question on appeal, as well as in the trial court, is not whether the summary judgment proof raises fact issues with reference to the essential elements of a plaintiff's claim or cause of action, but is whether the summary judgment proof establishes as a matter of law that there is no genuine issue of facts as to one or more of the essential elements of the plaintiff's cause of action. *Gibbs v. General Motors Corp.,*

---

**1.** The Honorable Warren Whitham, Justice, Court of Appeals, Fifth District of Texas at Dallas, Retired, sitting by assignment.

450 S.W.2d 827, 828 (Tex.1970). Therefore, a defendant is entitled to a summary judgment if he establishes, as a matter of law, that at least one element of plaintiff's cause of action does not exist. *See Rosas v. Buddies Food Store*, 518 S.W.2d 534, 537 (Tex.1975).

International argues that the record on appeal presents a number of genuine issues of material fact. We disagree. As will be seen from our disposition of International's remaining points of error, we decide the case on issues of law based on undisputed facts. Consequently, we avoid recitation of the extensive factual background and asserted fact disputes that International considers important in the present case. Because we conclude that as a matter of law Dresser and Fidelity do not owe International any duty asserted by International against Dresser or Fidelity and because the trial court correctly calculated prejudgment interest, it follows that the record on appeal presents no genuine issues of material fact. Therefore, we overrule International's first point of error.

## BACKGROUND AS TO THE PRINCIPAL ISSUES

Suffice it for our purposes, know that Dresser is a manufacturer of products operating as a self-insurer. As such, Dresser retains absolute and complete management and control of the handling and defense of all claims and lawsuits made or brought against it. Through a complicated arrangement, Fidelity has the appearance of a liability insurance carrier "fronting" as Dresser's primary insurer. In the present case, the principal issues arise from the fact that Dresser's excess carrier, International, does not approve of the manner in which Dresser handled and defended the underlying lawsuit (*Snyder*). The judgment in *Snyder* penetrated International's excess coverage threshold. Hence, International grounds its lawsuit against Dresser on two theories: first, breach of contract; and second, a common law tort duty to make reasonable attempts to settle *Snyder*.

As to the breach of contract assertion, International points to a document identified as the Special Claims Handling Agreement and then relies upon a document referred to in that agreement known as "the Guiding Principles" and asserted to be a part of the Special Claims Handling Agreement. As to the common law duty, International maintains that a self-insured entity who controls the investigation, defense, and settlement of claims and lawsuits against it should owe a direct duty to its excess insurer in connection with its conduct in its claims handling activities. In their briefs the parties agree that this is an issue of first impression in Texas and that to their knowledge there is only one published appellate court opinion in any jurisdiction that has considered the precise issue. We discuss that opinion later.

Thus, in its second point of error, International contends that the trial court erred in entering judgment for Dresser because the Special Claims Handling Agreement imposed duties on Dresser, and the summary judgment evidence creates issues of fact pertaining to those duties. In its third point of error, International contends that the trial court erred in entering judgment in favor of Dresser because Dresser owed common law duties to International to make reasonable attempts to settle the *Snyder* lawsuit. We first address the asserted contractual duty. Next, we consider the common law duty.

## THE "GUIDING PRINCIPLES"

Here we reach the question posed by International's second point of error of whether the Guiding Principles impose upon Dresser any duties whose breach would excuse International's contractual obligations to indemnify Dresser for covered losses. The document in question is headed "GUIDING PRINCIPLES FOR PRIMARY AND EXCESS INSURANCE COMPANIES." It is undisputed that by letter agreement (the Luter letter) Dresser agreed that "Dresser, the primary carrier and the excess carrier shall operate under the 'guiding principles for primary and excess insurance companies' and be bound by same." Dresser tells us in its brief that

"[s]olely for purposes of summary judgment and this appeal, [it is to be] assumed that Dresser, through the Luter letter, agreed to take on the role of 'primary insurer' as described by the Guiding Principles."

We take the case as given us by the parties. Here then are the Guiding Principles.

PURPOSE

To provide standards of conduct which, if followed by insurers in the handling of claims, will reduce if not eliminate the incidence of controversy between primary and excess insurers.

To provide a forum for the resolution of problems involving the interaction of primary and excess insurance coverages and their applicable policy limits.

It is implicit in these guiding principles that the primary insurer in its dealings with an excess insurer voluntarily adopt those standards of conduct which the law imposes upon the primary insurer in its dealings with its insured and that the excess insurer voluntarily refrain from any conduct which might create additional difficulty for the primary insurer in the handling of a case or increase the danger of the primary insurer's being liable in excess of its policy limit.

Nothing in these principles shall in any way abridge the rights of or the duties owed to the insured, indeed it is believed that the insured's interests will be better served by adherence of insurers to these principles.

SCOPE

Applicable to all liability coverages written and claims and suits arising thereunder involving companies both foreign and domestic and whether or not members of any associations or other group of companies.

All insurers writing liability insurance are urged to indicate their concurrence by endorsing these guiding principles.

GUIDING PRINCIPLES FOR INSURERS OF PRIMARY AND EXCESS COVERAGE

1. The primary insurer must discharge its duty of investigating promptly and diligently even those cases in which it is apparent that its policy limit may be consumed.

2. Liability must be assessed on the basis of all the relevant facts which a diligent investigation can develop and in the light of applicable legal principles. The assessment of liability must be reviewed periodically throughout the life of the claim.

3. Evaluation must be realistic and without regard to the policy limit.

4. When from evaluation of all aspects of a claim, settlement is indicated, the primary insurer must proceed promptly to attempt a settlement, up to its policy limit if necessary, negotiating seriously and with an open mind.

5. If at any time, it should reasonably appear that the insured may be exposed beyond the primary limit, the primary insurer shall give prompt written notice to the excess insurer, when known, stating the results of investigation and negotiation, and giving any other information deemed relevant to a determination of the total exposure, and inviting the excess insurer to participate in a common effort to dispose of the claim.

6. Where the assessment of damages, considered alone, would reasonably support payment of a demand within the primary policy limit but the primary insurer is unwilling to pay the demand because of its opinion that liability either does not exist or is questionable and the primary insurer recognizes the possibility of a verdict in excess of its policy limit, it shall give notice of its position to the excess insurer, when known. It shall also make available its file to the excess insurer for examination, if requested.

7. The primary insurer shall never seek a contribution to a settlement within its policy limit from the excess insurer. It may, however, accept contribution to a settlement within its policy limit from the excess insurer when such contribution is voluntarily offered.

8. In the event of a judgment in excess of the primary policy limit the primary insurer shall consult the excess insurer as to further procedure. If the primary insurer undertakes an appeal with the concurrence of the excess insurer the expense shall be shared by the primary and the excess insurer in such manner as they may agree upon. In the absence of such an agreement, they shall share the expense in the same proportions that their respective shares of the outstanding judgment bear to the total amount of the judgment. If the primary insurer should elect not to appeal, taking appropriate steps to pay or to guarantee payment of its policy limit, it shall not be liable for the expense of the appeal or interest on the judgment from the time it gives notice to the excess insurer of its election not to appeal and tenders its policy limit. The excess insurer may then prosecute an appeal at its own expense being liable also for interest accruing on the entire judgment subsequent to the primary insurer's notice of its election not to appeal. If the excess insurer does not agree to appeal it shall not be liable to share the cost of any appeal prosecuted by the primary insurer.

9. The excess insurer shall refrain from coercive or collusive conduct designed to force a settlement. It shall never make formal demand upon a primary insurer that the latter settle a claim within its policy limit. In any subsequent proceedings between excess insurer and primary insurer the failure of the excess insurer to make formal demand that the claim be settled shall not be considered as having any bearing on the excess insurer's claim against the primary insurer.

■ Both parties agree that we construe the Guiding Principles in light of *Coker v. Coker*, 650 S.W.2d 391 (Tex.1983). In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. *Coker*, 650 S.W.2d at 393. To achieve this objective, courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Coker*, 650 S.W.2d at 393. No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument. *Coker*, 650 S.W.2d at 393. With these rules in mind, we turn to the Guiding Principles to determine if it imposes upon Dresser the duty to settle the *Snyder* case within the limits of Fidelity's primary coverage limits. International reads such a duty in Guiding Principles 2, 3, and 4. *Coker*, however, teaches that no single provision controls and that we must look to the whole instrument and give effect to all of the provisions.

■ International strives mightily to make the Guiding Principles say that Dresser had the duty to settle the *Snyder* case within the limits of Fidelity's primary coverage limits. We conclude, however, that neither words can be found nor interpretation made which so say. Courts cannot make contracts for the parties. *Weitzman v. Steinberg*, 638 S.W.2d 171, 175 (Tex.App.—Dallas 1982, no writ). Nevertheless, International asks that we make a contract for the parties by adding to the Guiding Principles a provision that Dresser, as the self-insured, had the duty to settle the *Snyder* case within the limits of Fidelity's primary coverage limits. We decline to do so. Consequently, we conclude that as a matter of law the Guiding Principles do not impose upon Dresser the duty to settle the *Snyder* case within the limits of Fidelity's primary coverage limits. It follows that the Guiding Principles do not impose upon Dresser any duties whose breach would excuse International's contractual obligations to indemnify Dresser for covered losses. Consequently, for the reasons that follow, we must overrule International's second point of error.

In reviewing the Guiding Principles, it must be remembered that while Dresser agreed to operate under the Guiding Principles, it did not abandon its status as the "insured." Indeed, both parties treat

Dresser as having taken on the additional role of "primary insurer" as described in the Guiding Principles. Therefore, Dresser continues upon our stage as the "insured." Hence, construction of the Guiding Principles must take into account the fact that Dresser at all times remained International's insured. Thus, we conclude that any construction of the Guiding Principles must take into account the context in which the Guiding Principles are to be applied. Thus, we must remember that Dresser remained at all times the mutual insured of both Fidelity and International. Merely because we are to assume that Dresser agreed to take on the role of "primary insurer" as described in the Guiding Principles does not remove Dresser from its role as the insured. Indeed, neither the Luter letter nor the Guiding Principles indicate that Dresser waived or relinquished its rights as the insured. Thus, to the extent that Dresser can be placed in the role of a primary insurer under the Guiding Principles, Dresser must be seen as wearing two hats: "Dresser the insured" and "Dresser the primary insurer." With Dresser before us wearing these two hats, we reach the question of whether, properly construed, the Guiding Principles impose on Dresser, in either capacity, a contractual duty to International to settle the *Snyder* case within primary limits. In addressing the question, International acknowledges that the proper construction of a document requires an understanding of all its terms and an effort to avoid rendering any portion meaningless, citing *Coker*, 650 S.W.2d at 393. Here then is our construction of the Guiding Principles.

The stated "PURPOSE" of the Guiding Principles is instructive. One of the stated purposes of the Guiding Principles is to "reduce if not eliminate the incidence of controversy between primary and excess insurers." Furthermore, the purposes direct the excess carrier to "refrain from any conduct which might ... increase the danger of the primary insurer being liable in excess of its policy limit." Moreover, nothing in the principles "shall in any way abridge the rights of or the duties owed to the insured, indeed it is believed that the

insured's interest will be better served by adherence of insurers to these principles." With these purposes of the Guiding Principles before us, we read the principles down to the last enumerated principle, *i.e.*, principle 9. There we learn that "[t]he excess insurer shall refrain from coercive or collusive conduct designed to force a settlement. [The excess insurer] shall never make formal demand upon a primary insurer that the latter settle a claim within its policy limit." Applying *Coker*, as we must, we conclude that the true intentions of the parties as expressed in the Guiding Principles were not to create the contractual duty to International to settle the *Snyder* case within primary limits. We reach this conclusion because purposes of reducing, if not eliminating, controversy do not suggest creation of the asserted contractual duties and causes of action. We reach this conclusion because purposes directing the excess insurer to refrain from conduct increasing the primary carrier's exposure do not suggest creation of the asserted duties and causes of action. We reach this conclusion because purposes protecting rights of and duties owed to the insured do not suggest creation of the asserted duties and causes of action. We reach this conclusion because of limits placed on coercive conduct on the part of the excess insurer designed to force a settlement. We reach this conclusion because of limits placed on the excess insurer to demand settlement of a claim within a primary insurer's policy limits. With the purposes of the Guiding Principles and its principle 9 before us, we reason that the Guiding Principles do not impose upon the primary insurer, or the insured acting as a self-insurer who becomes a party thereto, a duty to the excess insurer to settle underlying litigation within primary limits. We conclude, therefore, that as a matter of law the Guiding Principles do not impose on Dresser, as "Dresser the insured" or as "Dresser the primary insurer," a contractual duty to International to settle the *Snyder* case within primary limits.

In deciding the question as we do, we emphasize that we decide the matter solely

on our construction of a document, the Guiding Principles, handed us by the parties and agreed to be contractual in nature between them. Thus, our disposition of International's second point of error is limited to the contention that this certain written agreement imposed contractual duties on Dresser. We have determined that the writing in question does not impose the asserted contractual duties on Dresser, and that is all that we have said. Construing the Guiding Principles as we do, we overrule International's second point of error.

### THE COMMON LAW DUTY

Next, we turn to consider the question raised by International's third point of error of whether Dresser owed common law duties to International to make reasonable attempts to settle the *Snyder* lawsuit. Earlier we mentioned the one published appellate court opinion brought to our attention by the parties. The argument that a self-insured such as Dresser should owe an excess carrier such as International a duty to settle within primary or self-insured limits was expressly rejected by the California Supreme Court in *Commercial Union Assurance Cos. v. Safeway Stores, Inc.*, 26 Cal.3d 912, 164 Cal.Rptr. 709, 610 P.2d 1038 (1980). The facts of *Safeway Stores* are similar to the present case. Travelers Insurance, the primary carrier, provided Safeway's first $50,000 of liability coverage. Safeway was self-insured between the sums of $50,000 and $100,000. Commercial Union and Mission Insurance provided excess coverage for Safeway's liability in the layer of $100,000 to $20,000,000. When a plaintiff obtained a judgment against Safeway in an amount in excess of $100,000, the excess carriers sued both Safeway and Travelers for failing to settle the case for less than that amount. The California Supreme Court expressly rejected the invitation to find that the insured owed an excess carrier any duty "which would require an insured contemplating settlement to put the excess carrier's financial interests on at least an equal footing with his own." *Safeway Stores*, 164 Cal. Rptr. at 714, 610 P.2d at 1043. Accordingly, the court affirmed the summary dismissal of the excess insurers' action against the insured. *Safeway Stores*, 164 Cal.Rptr. at 714, 610 P.2d at 1043.

As an insurance company providing excess coverage, International charged Dresser a substantial ($900,000) premium based on its calculation of the probability that Dresser might be exposed to a liability beyond the primary layer. In return for the premium received from Dresser, International knowingly accepted the risk of insuring such exposure. Further, International knew that, in product liability claims, Dresser controlled its own defense and settlement. The verdict in the *Snyder* case is precisely the risk that International, as well as Dresser, contracted to insure. As the California Supreme Court observed in *Safeway Stores*, "the primary reason excess insurance is purchased is to provide an available pool of money in the event that the decision is made to take the gamble of litigating." *Safeway Stores*, 164 Cal.Rptr. at 713, 610 P.2d at 1042. In the face of this reality, International seeks a ruling that would require an insured to settle any case, even one in which it believes liability is questionable or nonexistent, if there is any risk of a verdict impacting the excess layer of coverage. In short, International would have us impose on Dresser the financial risk of protecting excess insurers. This argument, however, ignores the rationale of *Safeway Stores*, which provides that, when deciding whether to try a lawsuit, an insured need not subordinate its own financial interests to that of the excess insurer: "The protection of the [excess] insurer's pecuniary interests is simply not the object of the bargain." *Safeway Stores*, 164 Cal.Rptr. at 713, 610 P.2d at 1042; *see, e.g.,* Syverud, *The Duty to Settle*, 76 VA.L.REV. 1113, 1181 (1990) (urging courts to refuse to extend duty-to-settle liability to insureds who refuse to settle; recognizing that insured's interest "involves additional, uninsurable stakes beyond the money handed over to the plaintiff" such as reputation, self-image, and other concerns).

*Safeway Stores* remains the law in California, *see Diamond Heights Homeowners*

*Ass'n v. National Am. Ins. Co.*, 227 Cal. App.3d 563, 277 Cal.Rptr. 906, 914–15 (1991), and continues to be cited with approval by numerous courts. *See, e.g., Certain Underwriters of Lloyd's v. General Accident Ins. Co.*, 909 F.2d 228, 232 (7th Cir.1990); *Commercial Union Ins. Co. v. Medical Protective Co.*, 426 Mich. 109, 393 N.W.2d 479, 482 (1986). Indeed, the Arizona Supreme Court recently expressed its agreement with the California Supreme Court. *See Twin City Fire Ins. Co. v. Superior Court*, 164 Ariz. 295, 792 P.2d 758, 760 (1990) (emphasizing that an excess carrier can protect itself by "appropriate language in the policy," quoting *Safeway Stores*, 164 Cal.Rptr. at 714, 610 P.2d at 1043).

■ International points us to no case that recognizes a cause of action by an excess insurer against its insured for failing to settle a lawsuit below the threshold of the excess policy. We decline to recognize such a common law duty giving rise to a cause of action by an excess insurer against its insured for failing to settle a lawsuit below the threshold of the excess policy. We agree with the California Supreme Court and adopt its holding. Therefore, we conclude that as a matter of law Dresser did not owe common law duties to International to make reasonable attempts to settle the *Snyder* lawsuit within primary or self-insured limits. Here, as in *Safeway Stores*, we hold that a policy providing for excess insurance coverage imposes no duty upon the insured to accept a settlement offer that would avoid exposing the excess insurer to liability. *See Safeway Stores*, 164 Cal.Rptr. at 714, 610 P.2d at 1043. We conclude that if there is no duty to accept a settlement offer, there is no duty to make a settlement offer. It follows that the trial court did not err in entering judgment in favor of Dresser because as a matter of law Dresser did not owe common law duties to International to make reasonable attempts to settle *Snyder*. We overrule International's third point of error.

## THE CLAIMS AGAINST FIDELITY

■ In its fourth point of error, International contends that the trial court erred in entering judgment for Fidelity because Fidelity owed common law duties to International to make reasonable attempts to settle the *Snyder* lawsuit. In this connection, we point out that International does not rely on the rule of equitable subrogation. *Safeway Stores* explains that rule. Since the insured would have been able to recover from the primary carrier for a judgment in excess of policy limits caused by the carrier's wrongful refusal to settle, the excess carrier, who discharged the insured's liability as a result of this tort, stands in the shoes of the insured and should be permitted to assert all claims against the primary carrier which the insured himself could have asserted. *Safeway Stores*, 164 Cal.Rptr. at 712, 610 P.2d at 1041. Hence, the rule does not rest upon the finding of any separate duty owed to any excess insurance carrier. *Safeway Stores*, 164 Cal. Rptr. at 712, 610 P.2d at 1041. In the present case, International seeks to have us impose that separate duty. In its fifth point of error, International contends that the trial court erred in entering judgment in favor of Fidelity because Fidelity assigned to Dresser its contractual obligation to control the investigation, defense, and settlement of products liability lawsuits against Dresser, and thus Fidelity is responsible for the wrongful acts of its claims handling assignee, Dresser. The parties each brief points of error four and five under one argument.

International insists that if we follow *Safeway Stores*, then it is imperative that a direct duty be imposed on Fidelity, as the primary carrier, to International, as the excess carrier, for the wrongful failure to make meaningful attempts to settle lawsuits, when merited by the circumstances. International reasons that Fidelity assigned its contractual obligations to control the investigation, defense, and settlement of products liability lawsuits against Dresser to Dresser itself. International asserts that this assignment of duties makes equitable subrogation unworkable because International as the excess carrier will always be subrogated to the rights of the party exercising the control, in this case

Dresser. We agree equitable subrogation is unworkable for the reason so expressed. Hence, International maintains we should impose a direct duty on Fidelity to International for the acts of its claims handling assignee. We disagree.

■ Before it issued its policy, International had full knowledge of the arrangement whereby Dresser became a self-insurer handling all matters with respect to claims and litigation. We decline to impose upon Fidelity a duty to wrench control of the *Snyder* lawsuit away from Dresser and settle it against Dresser's will on terms favorable to International's interest. Certainly, International cites no authority that persuades us that we should. Instead, International concedes in its reply brief that there are four jurisdictions that have rejected a primary-to-excess direct duty of care in cases such as this. *See Puritan Ins. Co. v. Canadian Universal Ins. Co.,* 775 F.2d 76, 79 (3rd Cir.1985); *Bohemia, Inc. v. Home Ins. Co.,* 725 F.2d 506, 512 n. 6 (9th Cir.1984); *Great Southwest Fire Ins. Co. v. CNA Ins. Cos.,* 557 So.2d 966, 969–70 (La.1990); *Allstate Ins. Co. v. Reserve Ins. Co.,* 116 N.H. 806, 373 A.2d 339, 340 (1976). Indeed, a federal trial court has addressed Fidelity's common law duties to Dresser's excess carrier in a case similar to the present case. *See Certain Underwriters at Lloyd's London v. Fidelity and Casualty Ins. Co.,* 789 F.Supp. 927 (N.D.Ill.1992). *Underwriters* speaks to the relationship between Dresser and Fidelity and involves a claim by Dresser's excess insurer that Fidelity breached a duty to the excess insurer when it failed to settle a product liability suit against Dresser. The district court granted summary judgment for Fidelity against the excess insurer, holding that Fidelity owed no duty to the excess insurer to settle a products liability claim against Dresser, their mutual insured. *Underwriters,* 789 F.Supp. at 933–34. From the opinion in *Underwriters,* we determine that Dresser acted as self-insurer much as in the present case and pursuant to similar arrangements with Fidelity as in the present case. In *Underwriters,* the court pointed out that Fidelity had no duty to settle the products liability claim because Fidelity lacked the authority to settle the products liability claim. *Underwriters,* 789 F.Supp. at 933. Thus, the court reasoned that the Dresser self-insurer arrangements with Fidelity gave Dresser exclusive control over products liability claims against it and, therefore, Fidelity lacked control over product liability claims against Dresser. *See Underwriters,* 789 F.Supp. at 933. Thus, the court reasoned further that since Fidelity could not force Dresser to settle, Fidelity could not have breached any duty to settle owed to Underwriters. *See Underwriters,* 789 F.Supp. at 933. Consequently, in the present case, as did the court in *Underwriters,* we hold that as a matter of law the primary insurer cannot have a direct duty to the excess insurer to do that which the primary insurer has no authority to do. *See Underwriters,* 789 F.Supp. at 934. We conclude, therefore, that Fidelity did not owe common law duties to International to make reasonable attempts to settle the *Snyder* lawsuit. We overrule International's fourth point of error.

■ As to the question of Fidelity's liability based on "assignment" to Dresser of Fidelity's contractual obligations to control investigation, defense, and settlement, we conclude that Fidelity did not "assign" any duties to Dresser. Granted that the Fidelity policy gives Fidelity the duty to defend and the right to control defense and settlement. But this is a contractual arrangement made between Dresser and Fidelity. As parties to that contract, Dresser and Fidelity are entitled to modify that contract. In the present case, as did the court in *Underwriters,* we hold that the Dresser self-insurer arrangements with Fidelity modified the primary insurance contract between Fidelity and Dresser and that consequently Dresser by contract had sole authority to settle products liability claims against it. *See Underwriters,* 789 F.Supp. at 932. Thus, we conclude that modification is not "assignment." Because we conclude that the "assignment" complained of in International's fifth point of error did not occur, we overrule International's fifth point of error.

## PREJUDGMENT INTEREST

In its sixth point of error, International contends that the trial court erred in entering a judgment in favor of Dresser that included an award of prejudgment interest calculated at ten percent because the applicable prejudgment interest rate is six percent under article 5069–1.03. *See* TEX. REV.CIV.STAT.ANN. art. 5069–1.03 (Vernon 1987). International would have us treat the present case as a lawsuit involving an ascertainable sum payable on an insurance policy contract and governed by the above statute pertaining to interest rates. We disagree with International's perception of this lawsuit. Because tort law was involved in the determination of the resolution of this case, this is not a pure contract case limited only to contract law. *See Shell Pipeline Corp. v. Coastal States Trading, Inc.*, 788 S.W.2d 837, 848–49 (Tex. App.—Houston [1st Dist.] 1990, writ denied). We conclude, therefore, that because the present case required the resolution of issues of tort as well as contract law, the trial court correctly awarded prejudgment interest at a rate of ten percent per annum rather than the six percent contract rate provided in article 5069–1.03. *See Shell*, 788 S.W.2d at 848–49. Because the statutory rate of six percent does not apply, we overrule International's sixth point of error.

## DENIAL OF ATTORNEY'S FEES TO DRESSER AND FIDELITY

In their sole cross-point, Dresser and Fidelity contend that the trial court abused its discretion in refusing to award reasonable attorney's fees to Dresser and Fidelity. The present case began as a declaratory judgment suit brought by International. The grant or denial of attorney's fees in a declaratory judgment action lies within the discretion of the trial court, and its judgment will not be reversed on appeal absent a clear showing that it abused that discretion. *Oake v. Collin County*, 692 S.W.2d 454, 455 (Tex.1985). Dresser and Fidelity fail to persuade us that the trial court abused its discretion in denying them attorney's fees. Instead, Dresser and Fidelity argue that they are entitled to awards of attorney's fees as the prevailing party in a declaratory judgment action brought under Chapter 37 of the Texas Civil Practice and Remedies Code. We disagree. "Prevailing party" is not the test. *Peko Oil USA v. Evans*, 800 S.W.2d 572, 579 (Tex.App.—Dallas 1990, writ denied). We conclude that this lawsuit was brought for the legitimate purpose of determining unclear questions existing under the law to which there was no clearly defined precedent or authority in Texas. Considering these factors, we cannot say that the trial court abused its discretion in denying Dresser and Fidelity's request for attorney's fees. *See City of Port Arthur v. International Ass'n of Fire Fighters, Local 397*, 807 S.W.2d 894, 901 (Tex.App.—Beaumont 1991, writ denied). It follows that the trial court did not abuse its discretion or err in refusing to award reasonable attorney's fees to Dresser and Fidelity. We overrule Dresser and Fidelity's sole cross-point.

Affirmed.